RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0127P (6th Cir.)
File Name: 02a0127p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

KIM MOSS,
     *Petitioner-Appellant,*

     *v.*

GERALD HOFBAUER,
     *Respondent-Appellee.*

No. 00-1518

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-72172—John Corbett O'Meara, District Judge.

Argued: November 28, 2001

Decided and Filed: April 12, 2002

Before: CLAY and GILMAN, Circuit Judges; EDGAR,
Chief District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Andrew N. Wise, FEDERAL PUBLIC
DEFENDERS OFFICE, Detroit, Michigan, for Appellant.
Janet A. Van Cleve, OFFICE OF THE ATTORNEY

———————————

[*]The Honorable R. Allan Edgar, Chief United States District Judge
for the Eastern District of Tennessee, sitting by designation.

GENERAL, Lansing, Michigan, for Appellee.  **ON BRIEF:**
Andrew N. Wise, FEDERAL PUBLIC DEFENDERS
OFFICE, Detroit, Michigan, for Appellant.  Janet A. Van
Cleve, OFFICE OF THE ATTORNEY GENERAL, Lansing,
Michigan, for Appellee.

   GILMAN, J., delivered the opinion of the court, in which
EDGAR, D. J., joined.  CLAY, J. (pp. 28-42), delivered a
separate dissenting opinion.

————————————

### OPINION

————————————

   RONALD LEE GILMAN, Circuit Judge.  On January 20,
1985, Kim Moss was convicted by a state court jury on one
count of first-degree murder and on one count of possession
of a firearm during the commission of a felony.  Moss was
sentenced to life imprisonment without the possibility of
parole for the murder conviction, and to two years'
imprisonment for the firearm conviction.    After
unsuccessfully pursuing all available state court relief, Moss
petitioned for a writ of habeas corpus in federal district court.
The district court, after conducting an evidentiary hearing,
denied Moss's petition.  For the reasons set forth below, we
**AFFIRM** the judgment of the district court.

### I.  BACKGROUND

   Moss was convicted of first-degree murder and possession
of a firearm during the commission of a felony for the killing
of Darrell Manley.  Keith Gould, Moss's codefendant at trial,
was convicted of the same offenses.  Andrus Thomas, a third
codefendant, pled guilty to second-degree murder and
possession of a firearm during the commission of a felony.
The Michigan Court of Appeals summarized the facts that led
to Moss's conviction as follows:

   On June 13, 1984, Darrell Manley sustained four
   gunshot wounds during a confrontation with defendants

According to the majority, Modelski's closing was simply brief and her statement that "'there is more than reasonable doubt' about Petitioner's guilt" would not have given rise to a different result. I disagree with the majority's assessment for two reasons. First, unlike the Court in *Groseclose*, the majority once again views Modelski's poor performance in this regard in a vacuum as opposed to looking at this deficient closing as a whole along with her other deficiencies. *See Groseclose,* 130 F.3d at 1169 (viewing counsel's deficiencies as a whole when determining "patent" ineffectiveness). Second, the majority does not provide Modelski's incriminating statement during closing argument in full. Modelski's statement to the jury during closing argument for which Petitioner takes issue actually states as follows: "Now again, my argument is, that there is more than reasonable doubt to believe that Kim Moss shot anyone." (J.A. at 561.) Obviously, this statement sends a very different message than the majority's partial quotation of Modelski's statement that "'there is more than reasonable doubt' about Petitioner's guilt." That aside, however, as in *Groseclose*, I believe that Modelski's deficient closing along with her other many deficient acts and omissions resulted in prejudice that is "patently" clear to the point that, but for these errors, the outcome of Petitioner's case would likely have been different. *Id.* at 1170; *see also Strickland*, 466 U.S. at 693-94.

The Supreme Court has long held that the failure of an accused to receive the *effective* assistance of counsel "convert[s] the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel. The Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment." *Avery v. Alabama*, 308 U.S. 444, 446 (1940) (footnote omitted). Because I find Modelski's performance so deficient that it amounted to nothing more than a formal compliance with the Constitution such that Petitioner was left with no counsel at all in violation of his Sixth Amendment right, I would grant Petitioner's application for a writ of habeas corpus, and I therefore respectfully dissent.

Moss and Gould and another individual identified as Andrus Thomas. The two wounds to the victim's upper left chest were fatal. Eyewitness testimony established that there were two series of gunshots. First, Thomas took a gun out of defendant Moss's hand and fired twice at the victim. The victim grabbed his side and collapsed to the ground. Secondly, Moss took the gun and fired several shots at the victim as he lay on the ground. Thomas ran in one direction, while Moss and Gould ran together in another. An eyewitness, James Freeman, heard Moss say as they ran "He is dead, man, I killed him." Moss then asked Gould if he had the guns and Gould responded "yeah."

According to Higa Vaught, who was with the victim, the confrontation stemmed from a dispute over a gun. Earlier in the day, Vaught accompanied the victim to Moss's apartment where the victim asked Moss for his (the victim's) pistol. Moss informed the victim that Gould had the pistol, so the victim and Vaught went to Gould's house. After Gould denied that he had the pistol, the victim and Vaught left. Later, they encountered Gould at a basketball court. The victim grabbed Gould by the neck, choked him, and started shaking him for information about the gun. After this physical confrontation ended, the victim said "somebody is going to be smoking [beaten up] tonight" if he did not get the gun.

Sometime later, the victim and Vaught encountered Moss and Gould outside of Moss's apartment building. Thomas arrived a short time thereafter. Moss had a gun in his left hand on the side. He and the victim began arguing. When Thomas appeared, the victim said to him "I have been wanting to get at you anyway." Thomas grabbed the gun from Moss and shot the victim. Although Vaught did not see who fired the second series of shots to the victim, another eyewitness, Nicole Purdie, identified Moss as the shooter.

(Alteration in original.)

Following his conviction, Moss appealed. Moss claimed that the evidence was insufficient to sustain his conviction, that the trial judge gave erroneous jury instructions, that the admission of a statement made by Gould violated Moss's Sixth Amendment right to confront the witness against him, that prosecutorial misconduct occurred, and that his trial counsel was ineffective. After concluding that none of Moss's claims provided grounds for reversal, the Michigan Court of Appeals affirmed his conviction on April 20, 1989. The Michigan Supreme Court denied Moss's request for leave to appeal on July 30, 1990.

Moss subsequently filed a motion for relief from judgment in the state trial court, seeking a new trial on the basis of newly discovered evidence and requesting an evidentiary hearing on the issue of ineffective assistance of counsel. The newly discovered evidence consisted of an affidavit that Thomas signed two years after the trial in which he averred that he was the only defendant who fired the gun during the altercation that led to Manley's death.

On February 14, 1994, the trial court denied Moss's motion. The court concluded that Thomas's version of the confrontation could have been discovered through the exercise of reasonable diligence by Moss's trial counsel. As the court reasoned, Thomas was available to testify at the trial, but Moss's trial counsel did not call Thomas as a witness because, according to correspondence between Moss's trial counsel and his new appellate counsel, at the time of trial Thomas would have testified that he fired only two of the four bullets. The court also determined that an evidentiary hearing concerning Moss's ineffective-assistance-of-counsel claim was not warranted for the reasons set forth by the Court of Appeals in its earlier ruling. Moss's appeals were denied by both the Michigan Court of Appeals and the Michigan Supreme Court.

On May 17, 1997, Moss petitioned for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Eastern District of Michigan. The

*Id.* We then found that it was unnecessary to determine whether to analyze these deficiencies under a *Strickland* standard inasmuch as "the prejudice resulting from [defense counsel's] lawyering [was] so patent. We find it quite clear that there were defense tactics available to a reasonably competent attorney that create a reasonable probability that, in the absence of [defense counsel's] incompetence, the jury would have a reasonable doubt respecting Groseclose's guilt." *Id.* at 1170.

Modelski's failure to present a meaningful defense, failure to cross-examine the prosecution's two key witnesses, decision to reserve her right to deliver an opening statement which ultimately resulted in no opening statement, failure to make any objections at trial, and decision to deliver only a very brief closing argument wherein she virtually endorsed Petitioner's guilt, certainly appear to fall within the bounds of deficient conduct the likes of which we found patently prejudicial in *Groseclose*. *See* 130 F.3d at 1170. I find the majority's attempts to distinguish *Groseclose* from the matter at hand to be unavailing. First, the majority contends that unlike in *Groseclose*, the evidence against Petitioner was not weak because of the testimony of the two eyewitnesses, Freeman and Purdie. As consistently emphasized throughout this dissent, the jurisprudence and scholarly journals have made clear the inherent unreliability of eyewitness testimony. Next, the majority contends that because Petitioner does not identify any witnesses that his counsel should have called or objections that his counsel should have made, Modelski's performance cannot be considered deficient under *Groseclose*. However, in support of this contention, the majority does not rely upon *Groseclose*, but instead relies upon a case from the Ninth Circuit, likely because *Groseclose* did not make such a requirement of the petitioner. As a result, the majority's attempt to distinguish *Groseclose* on this basis is simply wrong.

Finally, the majority claims that unlike in *Groseclose*, Petitioner was not denied his right to meaningful adversarial challenge by Modelski's deficient closing argument.

judge's determination that Thomas's testimony at the evidentiary hearing lacked credibility." First, the fact that the prosecutor may have impeached Thomas may have supported Thomas' claim that he only pleaded as he did in order to satisfy the police. Stated differently, the prosecution's ability to impeach Thomas may have strengthened the force of Thomas' claim as to why he did not come forward with this exculpating evidence sooner. In addition, the magistrate's assessment of Thomas' credibility may have been different from that of the jury, particularly if Modelski had taken the time to cross-examine the prosecution's two key witnesses. As the majority itself makes note, the reason that this Court is reluctant to set aside credibility determinations made by a jury is because the jury has had the opportunity to view the witness on the stand and assess his demeanor. In fact, the prosecution had faith enough in Thomas' credibility to call him as a witness. It therefore seems illogical to hold that Modelski's failure to pursue a defense through Thomas cannot be found prejudicial because Thomas was incredible.

Petitioner relies upon *Groseclose v. Bell*, in support of his contention that Modelski rendered ineffective assistance by, among other things, her failure to pursue Thomas as a defense strategy. In *Groseclose*, this Court found the petitioner's counsel constitutionally ineffective and nothing more than "'a person who happen[ed] to be a lawyer.'" *See* 130 F.3d at 1169. The Court found three aspects of defense counsel's performance to be "especially appalling" in reaching this conclusion:

(1) his failure to have any defense theory whatsoever; (2) his failure to conduct any meaningful adversarial challenge, as shown by his failure to cross-examine more than half of the prosecution's witnesses, to object to any evidence, to put on any defense witnesses, to make a closing argument, and, at sentencing, to put on any meaningful mitigation evidence; and (3) perhaps most importantly, his abdication of his client's case to Rickman's counsel.

district court granted an evidentiary hearing on Moss's claim of ineffective assistance of counsel, but dismissed his other claims.

According to the district court, an evidentiary hearing was necessary because the state courts neither developed a factual record regarding whether the performance of Moss's counsel was constitutionally deficient nor fully addressed the merits of his claim. The Michigan Court of Appeals had rejected Moss's claim that his counsel was ineffective in failing to object to the prosecutor's argument that Manley was not armed and in failing to challenge the voluntariness of Moss's statement to the police. Moss's request for an evidentiary hearing was denied by the state trial court "for the same reasons as in the April 20, 1989 Court of Appeals Opinion." As the district court noted, however, Moss's pro se appellate brief also mentioned his counsel's failure to cross-examine Freeman and Purdie, and Moss's motion for reconsideration and for an evidentiary hearing alleged that his trial counsel admitted Moss's guilt in her closing argument, failed to conduct an effective defense, and failed to cross-examine witnesses.

Pursuant to the district court's order, the evidentiary hearing was limited to "the issue of ineffective assistance of counsel regarding counsel's failure to cross-examine key prosecution witnesses, investigate and present possible defenses, including calling Andrus Thomas as a defense witness, and conceding petitioner's guilt in her closing statement." The district court referred the case to a magistrate judge to conduct the evidentiary hearing.

At the evidentiary hearing, Thomas testified that he fired all of the bullets that were in the gun and then threw the gun in the grass as he was fleeing the scene of the crime. He also testified that he was the one who said "I killed a man" as he was running down an alley. Thomas admitted that he had earlier told the police that he fired just two shots, but claimed that he made this statement only after the police officers said that they did not believe his initial version of what happened

and told him that they would allow him to go home if he signed the statement. According to Thomas, he did not hear any shots fired after he fled the scene, and any inconsistency with the prior statement that he made to the police was the result of his fear of going to jail and the instructions that he received from the police. Additionally, Thomas testified that the terms of his plea bargain required him to testify that he fired only two bullets. He therefore acknowledged that his testimony at his guilty plea hearing that he fired only two shots and that someone else also shot Manley had been untruthful.

Thomas was released from prison in 1989, after serving four years for second-degree murder. His sentence for this offense was a period of incarceration from 4 to 15 years. Thomas then served two years on parole for possessing a firearm during the commission of a felony.

Moss was the second witness to take the stand at the evidentiary hearing. He testified that Thomas fired all of the bullets in the gun and then fled. Moss claimed that after remaining at the scene of the shooting for about a minute, he and Gould ran back to Moss's apartment. In contrast to Freeman's testimony, Moss insisted that he did not say anything to Gould while they were running. According to Moss, his trial attorney – Sophie Modelski – never questioned him in detail about what occurred when Manley was shot. Moss also testified that he told Modelski that "I didn't do the shooting, that Mr. Thomas did the shooting." The record is unclear regarding whether Moss told Modelski that Thomas fired all of the bullets, or whether he told her that both Thomas and Gould shot Manley.

Modelski, the third witness, said that Moss consistently maintained that Gould had fired the gun, and that she did not remember Moss telling her that Thomas also shot Manley. Regarding her preparation for trial, Modelski admitted that she did not hire an investigator, interview any witnesses prior to trial, or attempt to locate other people who might have observed what occurred. Instead, she limited her actions to

medical examiner's testimony. Which is to say once again, that the majority considers each issue raised by Petitioner as to why Modelski was constitutionally ineffective in relation to her failure to cross-examine Purdie, in a vacuum, finding that no single issue rose to the level of ineffectiveness. However, the jury heard Purdie's testimony as a whole, and had Modelski brought to the fore the inherent unreliability of eyewitness testimony, the similarities in the appearance of Petitioner and Thomas, the inconsistencies in Purdie's testimony and the fact that in conflicted with the medical examiner's testimony, as well as Purdie's possible bias, a reasonable possibility exists that the outcome of Petitioner's trial would have been different. If Modelski's trial strategy was to discredit the testimony of key witnesses Purdie and Freeman, then her failure to cross-examine either of them – particularly considering that she presented no other defense on Petitioner's behalf – indicates that she had no strategy at all. *See Groseclose v. Bell*, 130 F.2d 1161, 1169 (6th Cir. 1997) (finding defense counsel's actions in failing to present a defense and failing to cross-examine more than half of the prosecution's witnesses, among other things, denied the petitioner the effective assistance of counsel).

In this regard, I also find Modelski's failure to present a defense on behalf of Petitioner in connection with her failure to interview Thomas as to the basis for his plea, and instead simply taking the statement in his plea agreement as true, to be below an objective standard of acceptable performance. Even when considering the discrepancy in the record as to whether Petitioner told Modelski that it was Thomas who did the shooting or whether he told Modelski that Gould did the shooting, the fact remains that Petitioner maintained his innocense to Modelski, and she did nothing to pursue this theory of defense. In other words, she did nothing to cast doubt in the minds of the jury as to Petitioner's guilt.

The majority dismisses Petitioner's claim on the basis that "the prosecutor could have thoroughly impeached Thomas with his contrary statements given first to the police and later at his guilty plea proceeding," and because of "the magistrate

may have discredited this damaging testimony had she interviewed and cross-examined Freeman, her decision not to cross-examine this witness cannot be considered as within the range of acceptable competent assistance. *See id.*; *Green*, 809 F.2d at 1263. In addition, Modelski's objectively unreasonable performance prejudiced Petitioner inasmuch as a possibility exists that if Modelski could have successfully discredited Freeman's damaging testimony, the outcome of the trial may have been different, especially when considering Modelski's other deficiencies at trial. The majority dissects Modelski's inactions and views them individually to conclude that Petitioner has not demonstrated prejudice because none of these actions individually would have changed the outcome of Petitioner's trial. Yet, the majority makes much of the fact that there were two eyewitnesses – Freeman and Purdie – when concluding that the evidence against Petitioner was significant. It seems inapposite for the majority to conclude that Modelski's efforts in discrediting the testimony of Freeman and Purdie would not have changed the outcome of the trial, while at the same time relying on the strength of these two witnesses' testimony in reaching that conclusion. In other words, the stronger the witnesses' testimony, the greater the need for effective cross-examination. This is particularly so when considering the fact that the unreliability of eyewitness testimony is well-established, a fact that could easily have been raised by Modelski in discrediting this testimony. *See, e.g., Watkins*, 449 U.S. at 349-50.

Along this line, the majority's conclusion that Modelski's failure to cross-examine Purdie as to the accuracy of her identification of Petitioner "fails to establish a reasonable probability of a different outcome" simply because Purdie saw Petitioner on a daily basis and identified him as the shooter at both the preliminary examination and at trial, ignores the wide body of legal precedent that firmly establishes the unreliability of eyewitness testimony. The majority's conclusion also fails to consider Modelski's failure to challenge the accuracy of Purdie's identification in light of other flaws in Purdie's testimony, such as the fact that her testimony was inconsistent and that it conflicted with the

consulting with the attorneys for Thomas and Gould, visiting the scene of the crime, and reviewing the evidence that the state provided to her. Modelski also acknowledged that she could not recall whether she presented an opening statement. She did remember, however, that she informed Moss of the State's guilty plea offer and that Moss rejected the offer despite her recommendation that he accept it.

According to Modelski, her trial strategy was based on raising a reasonable doubt about the credibility of Freeman and Purdie. Despite this approach, she made an intentional choice not to cross-examine either of them. She decided that Freeman's testimony—that he overheard Moss's on-the-run confession to killing a man—was inherently unbelievable, and that any cross-examination would have drawn more attention to his testimony. Furthermore, she believed that the cross-examination of Purdie by Gould's counsel made any additional cross-examination of her unnecessary.

Modelski acknowledged that she did not attempt to show that Moss never fired the gun, but instead pursued a theory that the circumstances of the shooting remained unclear. She never interviewed Thomas, nor did she attempt to discover the factual basis for his plea. Modelski further admitted that she did not learn of Thomas's claim that he fired all of the bullets until after the trial, when Moss's new appellate attorney contacted her and told her that Thomas had sent letters to Moss admitting that he was the only shooter. Instead, she had assumed the truth of the statement that Thomas had made to the police, which was introduced at the preliminary hearing, claiming that he had shot twice and then Moss had snatched the gun back. Modelski testified that she had no reason to believe that Thomas would testify differently if she had called him as a witness at trial.

Following the evidentiary hearing, the magistrate judge issued a Report and Recommendation, concluding that Moss had failed to establish a claim of ineffective assistance of counsel. The district court adopted the Report and Recommendation on May 2, 2000. This appeal followed.

## II. ANALYSIS

### A.   Standard of review

Because Moss filed his federal habeas corpus petition after the Antiterrorism and Effective Death Penalty Act (AEDPA) became effective, AEDPA's provisions apply to this case. *Campbell v. Coyle*, 260 F.3d 531, 538-39 (6th Cir. 2001). In considering the application of AEDPA, we review the district court's legal conclusions de novo and its factual findings under a clearly erroneous standard. *Id*. at 539.

AEDPA prohibits a federal court from granting a writ of habeas corpus to a person in custody pursuant to a state court judgment with respect to a claim that was adjudicated on the merits in state court

> unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A federal court may grant a writ of habeas corpus under § 2254(d)(1)'s "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (*Williams I*).

Section 2254(d)(1)'s "unreasonable application" clause also provides two potential bases for habeas relief. *Campbell*, 260 F.3d at 539. The first possibility occurs if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts . . . ." *Williams I*, 529 U.S. at 413. Second, relief is available under this provision if the state

examination of Purdie by Gould's counsel as deficient, it ultimately concludes that Modelski's deficient performance did not rise to the level of ineffective assistance of counsel under a harmless error standard of review. I disagree with the majority. As indicated above, Modelski's decision to remain mute as opposed to cross-examining Freeman and Purdie was prejudicial *per se* inasmuch as it effectively left Petitioner with no counsel at all during this critical stage of the trial, and failed to subject the prosecution's case to any meaningful adversarial testing. *See Cronic*, 466 U.S. at 659 (citing *Davis v. Alaska*, 415 U.S. 308 (1974)). However, as indicated in the following section, even when considering Petitioner's claim as to Modelski's failure to cross-examine Purdie along with Petitioner's other claims of ineffective assistance under a harmless error standard, Petitioner has demonstrated prejudice from Modelski's deficient performance.

### B.   Modelski Rendered Ineffective Assistance of Counsel Under a Harmless Error Standard

Modelski's deficiencies of which Petitioner complains include her failure to cross-examine Freeman and Purdie, as well as her failure to make an opening statement, failure to pursue Petitioner's theory that Thomas was the sole shooter, and other allegations such as Modelski's failure to call any defense witnesses, failure to object at trial, and her decision to give a very brief closing argument wherein she made a statement "akin to a concession" that Petitioner was guilty.

Beginning with Modelski's failure to cross-examine Freeman, the majority found that Modelski's inactions simply amounted to trial strategy inasmuch as Modelski found Freeman's statement inherently unbelievable. "Under the analysis set forth in *Strickland*, even deliberate trial tactics may constitute ineffective assistance of counsel if they fall 'outside the wide range of professionally competent assistance.'" *Martin*, 744 F.2d at 1249 (quoting *Strickland*, 466 U.S. at 691). As discussed above, considering the fact that Freeman testified to an alleged incriminating statement made by Petitioner, and the many bases upon which Modelski

cross-examination of a witness by a co-defendant. However, Modelski's decision to rest upon the co-defendant's cross-examination does raise a presumption of prejudice inasmuch as Petitioner had consistently informed Modelski that he did not do the shooting, the testimony of this eyewitness went to the heart of Petitioner's guilt, and the jurisprudence and legal scholarship have well established that while eyewitness testimony has a profound impact on juries, it is often times extremely unreliable. *See Watkins v. Sowders*, 449 U.S. 341, 349-50 (1981) (Brennan, J., dissenting) (recognizing the "extraordinary impact" of eyewitness identification evidence, while reminding the Court of its history of recognizing the inherently suspect qualities of eyewitness identification evidence); *United States v. Langford*, 802 F.2d 1176, 1182 (9th Cir. 1986) (noting that expert testimony can and should be used to explain to a jury the problems inherent in eyewitness identification, and citing a litany of cases recognizing the problem of unreliable eyewitness testimony); *see also* Gary L. Wells, *What Do We Know About Eyewitness Identification?*, 48 AM. PSYCHOLOGIST 553, 554 (1993) (documenting that eyewitness error was the leading single reason for false convictions). The need to cross-examine Purdie becomes particularly acute in this regard because, as Petitioner argues, he and Thomas resemble each other.

Moreover, where this Court has found that a defense counsel's decision to rely entirely upon a co-defendant's counsel at trial to be constitutionally ineffective even under a harmless error standard of review, the prejudicial effect of Modelski's failure to cross-examine Purdie in this case becomes exceedingly apparent. *See Groselose v. Bell*, 130 F.3d 1161, 1170 (6th Cir. 1997) (finding it "mind-boggling" that the petitioner's counsel would defer to a co-defendant's counsel where the two defense strategies were antagonistic). Indeed, in the matter at hand, Purdie testified that she did not see co-defendant Gould at the scene; therefore, cross-examination of Purdie by Gould's counsel could not have taken into account the type of cross-examination needed to be effective for Petitioner's defense. Although the majority recognizes that Modelski's decision to rely upon the cross-

court decision "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context." *Campbell*, 260 F.3d at 539. The proper inquiry for the "unreasonable application" analysis is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams I*, 529 U.S. at 409. As a result, "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

AEDPA further constrains a federal habeas court by establishing a presumption that a state court's determination of a factual issue is correct, and mandating that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In addition, AEDPA places new restrictions on a district court's ability to hold an evidentiary hearing. 28 U.S.C. § 2254(e)(2). These restrictions apply, however, only if "the applicant has failed to develop the factual basis of a claim in State court proceedings." *Id*.; *Williams v. Taylor*, 529 U.S. 420, 437 (2000) (*Williams II*) (noting that a petitioner who has developed the facts under § 2254(e)(2) "will be excused from showing compliance with the balance of the subsection's requirements"). "[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams II*, 529 U.S. at 432. As a result, when a petitioner pursues a claim with proper diligence in state court but is unable to develop its factual basis, AEDPA does not prevent the district court from ordering an evidentiary hearing to develop the factual record. *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) (remanding the case for an evidentiary hearing because the petitioner "exercised the necessary diligence in attempting to establish the factual record in state court").

## B.   Ineffective assistance of counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-part test for evaluating whether the performance of counsel violates a defendant's rights under the Sixth Amendment. A defendant must first show that the performance of his or her counsel was "below an objective standard of reasonableness." *Id.* at 688. In order to avoid second-guessing trial counsel's strategic decisions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks and citation omitted). Accordingly, "an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken." *Campbell*, 260 F.3d at 551.

The second condition that must be met for an ineffective-assistance-of-counsel claim to succeed is a showing that the counsel's deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 691-92. To satisfy this condition, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Although *Strickland*'s requirement of an individualized inquiry into defense counsel's performance provides the general framework for analyzing ineffective-assistance-of-counsel claims, an irrebuttable presumption of prejudice applies in very limited circumstances. *United States v. Cronic*, 466 U.S. 648, 658-62 (1984) (noting that "[t]here are . . . circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified"). The complete absence of counsel, or the denial of counsel at a critical stage of a defendant's trial, for

tested"). The majority's reasoning in this regard may lend itself to a harmless error analysis but it is misplaced in the context of an ineffective assistance of counsel *per se* claim. In any event, it can hardly be said that Modelski's preparation for trial should cut against a finding of ineffectiveness where she failed to interview a single witness in this capital murder case. And, aside from her apparent state of consciousness during trial, there is nothing to indicate that she "actively" represented Defendant or that she was attentive. In fact, the record strongly suggests otherwise where Modelski failed to make an opening statement, failed to make a single objection, failed to call a single witness, and gave a very brief closing argument which, as will be illustrated, actually appeared at one point to bolster Defendant's guilt. The majority's position appears to come down to a finding that so long as counsel is physically present during trial and conscious, ineffective assistance of counsel *per se* cannot be found. Of course, *Cronic* tells us otherwise. *See Cronic*, 466 U.S. at 659.

Modelski's failure to cross-examine Nicole Purdie on the basis that she believed the cross-examination of Purdie by co-defendant's counsel was sufficient follows the same path as her failure to cross examine Freeman. As with Freeman, *Green* can be looked to for support. In *Green* the petitioner's counsel stated on the record that he had conferred with the co-defendant's counsel, as well as his client, and that all were in agreement that the cross-examination of the victim by co-defendant's counsel was sufficient; however, this Court found these facts unavailing considering the nature of the testimony involved. *See Green*, 809 F.2d at 1263 ("It is difficult to perceive a more critical stage of a trial than the taking of evidence on the defendant's guilt.") Here, Purdie testified as an alleged eyewitness to seeing Petitioner commit the shooting and, therefore, as in *Green*, Modelski's decision to rest upon the cross-examination of Purdie by counsel for the co-defendant is presumptively prejudicial.

Again, that is not to say that a presumption of prejudice will arise in every case where the defense counsel relies upon the

Likewise, in the matter at hand, although Modelski was physically present during Freeman's cross-examination by the co-defendant's counsel, if any, she remained mute when presented with the opportunity to cross-examine Freeman on behalf of Petitioner thereby rendering her constructively absent during this critical stage where Freeman was testifying as to Petitioner's guilt. Accordingly, as in *Green*, prejudice must be presumed. *See Green*, 809 F.2d at 1263. And, as in *Green*, the fact that Modelski claimed that she made a deliberate decision not to cross-examine Freeman as part of her trial strategy is of no consequence to the presumption of prejudice. *See id.* at 1261-62; *see also Martin v. Rose*, 744 F.2d 1245, 1250-51 (6th Cir. 1984) (finding that the defense counsel's failure to participate in the trial by standing mute, despite the fact that counsel had deliberately chosen to stand mute as part of his trial strategy, made the adversary process unreliable to the extent that prejudice was presumed). Indeed, Modelski's failure to cross-examine Freeman may be likened to her being asleep during this critical stage of the proceedings where evidence of Petitioner's guilt was being taken, to the extent that Petitioner was left with no representation whatsoever. *See Burdine v. Johnson*, 262 F.3d 336, 349 (5th Cir. 2001) (*en banc*) (presuming prejudice where the defendant's counsel slept through portions of the defendant's trial on the basis that "[u]nconscious counsel equates to no counsel at all").

If supposition is to be had in this case, it lies in the majority opinion wherein the majority concludes that Modelski's preparation for trial, her "active" representation of Defendant at trial, along with her presence and attentiveness during the trial distinguishes *Green* and the cases noted above from the facts of this case. First, whatever Modelski's actions may have been before trial, or whatever actions she may have taken during trial separate and apart from the matter of these two key witnesses, the fact remains that her *inactions* deprived Defendant of his well-recognized right to effective cross-examination. *See Davis*, 415 U.S. at 316 (recognizing that "[c]ross-examination is the principal means by which the believability of a witness and the truth of this testimony are

example, violates a defendant's Sixth Amendment right to counsel without a showing of prejudice. *Id.* at 659 & n.25.

In addition, "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* at 659. This possibility of constructive denial of counsel is limited to situations involving "constitutional error of the first magnitude," which cannot be cured even if no prejudice is shown. *Id.* (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974), in which the defendant was denied the right of effective cross-examination). "Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at 659 n.26.

Finally, there may be "some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659-60. The Supreme Court explained in *Cronic* that *Powell v. Alabama*, 287 U.S. 45 (1932), a case in which defense counsel was not appointed until the very day of trial, was such a case. *Cronic,* 466 U.S. at 660-61. Because of the last-minute appointment of counsel for the defendants in *Powell*, " the surrounding circumstances made it so unlikely that any lawyer could provide effective assistance that ineffectiveness was properly presumed without inquiry into actual performance at trial." *Id.* at 661. The Court noted, on the other hand, that "the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *Id.* at 656-57 n.19.

In the present case, Moss was not denied the right of counsel at a critical stage of his trial. Nor is this a situation in which surrounding circumstances prevented the possibility of his counsel effectively representing Moss's interests. Finally, as the following discussion indicates, Moss's counsel did not "entirely fail[] to subject the prosecution's case to meaningful adversarial testing." *Id.* at 659. Modelski's preparation prior to trial included meeting with Moss before the preliminary examination, attending the preliminary examination, visiting Moss several times in jail, consulting with the attorneys for Thomas and Gould, visiting the scene of the shooting, and reviewing the records from the police department, which she obtained after drafting a discovery order. She also encouraged Moss to accept the guilty plea offer that the State had presented to him. During the trial, Modelski reserved her right to make an opening statement, cross-examined several witnesses, and made a closing argument.

Although some of Modelski's decisions might have been unwise, her representation did not lead to "an actual breakdown of the adversarial process during the trial of this case." *Cronic*, 466 U.S. at 657-58. Her performance is readily distinguishable from situations where ineffective assistance has been presumed. *See, e.g., Rickman v. Bell*, 131 F.3d 1150, 1156-60 (6th Cir. 1997) (holding that *Cronic* applied where defense counsel "combined a total failure to actively advocate his client's cause with repeated expressions of contempt for his client for his alleged actions"); *Martin v. Rose*, 744 F.2d 1245, 1250-51 (6th Cir. 1984) (holding that defense counsel's "total lack of participation deprived Martin of effective assistance of counsel at trial as thoroughly as if he had been absent," thereby violating Martin's Sixth Amendment rights "even without any showing of prejudice"); *Burdine v. Johnson*, 262 F.3d 336, 349 (5th Cir. 2001) (en banc) (holding that *Cronic* applied where defense counsel was asleep during substantial portions of Burdine's trial, noting that "[u]nconscious counsel equates to no counsel at all"); *Childress v. Johnson*, 103 F.3d 1221, 1231 (5th Cir. 1997) (holding that *Cronic* applied where defense counsel appeared in court only "to stand by, listen to the judge, and respond to

questions at all, so, therefore, I told Mr. Brian Fallon [the prosecutor], even though he had her here for my cross-examination, I told him that I would not be asking her any questions.
That's basically it, Judge. I don't know what else I can say.

*Id.* The court denied the petitioner's request for a mistrial; the petitioner was convicted; and she ultimately filed an application for a writ of habeas corpus claiming, among other things, that she was denied her Sixth Amendment right to the effective assistance of counsel due to her counsel's absence during cross-examination of the victim. *Id.* at 1257. The district court agreed and granted the writ on this basis. *Id.* The respondent State of Ohio appealed to this Court, wherein the issue before the Court was "whether harmless error analysis is appropriate where a petitioner demonstrates she was unrepresented by counsel for a critical period of time during the taking of evidence against her at trial." *Id.* at 1258.

In answering this question in the negative, this Court began by reviewing the above-quoted colloquies and found that "[a]lthough it may be that some absences by a criminal defendant's attorney might be so de minimis that there would be no constitutional significance, the record unequivocally demonstrates that Mr. Carlin's absence was not de minimis. In our view, the record permits but one conclusion: petitioner's constitutional right to counsel was implicated by Mr. Carlin's [petitioner's counsel's] absence." *Green*, 809 F.2d at 1261-62. Having so found, we were then faced with the constitutional significance of counsel's absence, meaning whether it lended itself to a harmless error review, or whether it was of the type where prejudice is legally presumed. *Id.* In deciding that this was a case in which prejudice should be presumed, we held that "[i]t is difficult to perceive a more critical stage of a trial than the taking of evidence on the defendant's guilt[,]" and that the absence of the petitioner's counsel at this critical stage was deficient as a matter of law, such that prejudice was presumed. *See id.* at 1263.

he would be content with Mr. Saughnessy's [co-defendants' counsel's] cross-examination on behalf of all three defendants, so with that assurance, the Court feels that one cross-examination is sufficient.

*Id.* at 1260.

Thereafter, however, the petitioner addressed the trial judge and asked for a continuance so that her counsel could be present to cross-examine the victim. *Id.* The prosecutor agreed to have the victim available to testify the next day, and the court granted the continuance. *Id.* at 1260-61. The next morning, the following colloquy occurred:

THE COURT: All right, Mr. Carlin [Petitioner's counsel], I understand you want to go on the record.

MR. CARLIN [PETITIONER'S COUNSEL]: Yes, Your Honor. I have no questions of the witness, Maureen McNea, and I have been informed by my client, Pamela Green, that she wishes to have me withdraw and find new counsel. I have to inform the court of that.

THE COURT: All right. Miss Green, the Court will not permit that at this late stage of the trial. This trial must proceed. All right. Call the jury.

*Id.* at 1261. That afternoon, the petitioner attempted to move for a mistrial, as her counsel communicated to the court:

MR. CARLIN [PETITIONER'S COUNSEL]: I assume that because I wasn't present during the entire examination of the first witness, I would assume that that is the reason why she would want a mistrial.
I was under the understanding there was a waiver involved in that, number one, and number two, Mr. Shaughnessy [co-defendant's counsel] and I discussed the testimony and the statements made by the first witness and it was our, including Pamela Green [the petitioner], it was our understanding that it would be in the best interests of our case not to ask her any further

any contingencies that might arise," taking "no responsibility for advocating the defendant's interests at a critical stage of the [guilty plea hearing]").

Several circuits have drawn the distinction between *Cronic*'s per se rule and *Strickland*'s requirement of deficient performance and prejudice in terms of whether defense counsel provided no representation at all versus bad, even deplorable assistance. *See, e.g., Glover v. Miro*, 262 F.3d 268, 276-77 (4th Cir. 2001) (holding that *Cronic* did not apply, noting that "[t]his case is not one where the lawyer literally sleeps through the State's case or otherwise might as well be absent"); *Childress*, 103 F.3d at 1229-30 (noting that "we have consistently distinguished shoddy representation from no defense at all"); *Scarpa v. DuBois*, 38 F.3d 1, 12-15 (1st Cir. 1994) (distinguishing "maladroit performance" from "non-performance," and holding that "*Strickland* controls inquiries concerning counsel's actual performance at trial, and that substandard performance, in the nature of particular attorney errors, cannot conclusively be presumed to have been prejudicial").

Although this court has not adhered to an absolute dividing line, we have applied *Cronic* only where the constructive denial of counsel and the associated collapse of the adversarial system is imminently clear. *See Rickman*, 131 F.3d at 1156-60 (holding that defense counsel's performance amounted to the constructive denial of counsel because his hostility towards his client at trial "succeeded in presenting a terrifying image of Rickman, and thereby aligned [defense counsel] with the prosecution against his own client"). We find no similar circumstances in the present case.

The dissent reaches the opposite conclusion, applying *Cronic*'s rule of per se prejudice on the basis of Modelski's failure to cross-examine the government's two key eyewitnesses, Freeman and Purdie. Because we believe that this conclusion constitutes an unwarranted extension of *Cronic* and its progeny, we respectfully disagree.

The dissent recognizes that Modelski was not physically absent, sleeping, or otherwise incapacitated during either the direct examination of these witnesses by the state or the cross-examination conducted by counsel for Moss's codefendant. It nevertheless maintains that if Modelski had cross-examined Freeman and Purdie, she might have been able to discredit their testimony. We believe that this reasoning is flawed because it is based upon supposition as to what cross-examination might have revealed and broad generalizations about the unreliability of eyewitness testimony.

As more fully discussed in Part II.B.2. below, Modelski had prepared herself for trial, actively represented Moss during the proceedings, and articulated strategic reasons for not cross-examining the two witnesses in question. These factors, combined with Modelski's presence and attentiveness during Moss's trial, distinguish the present case from the cases upon which the dissent relies. *See, e.g., Green v. Arn*, 809 F.2d 1257, 1263 (6th Cir.) (applying *Cronic* where counsel was not present during the cross-examination of a government witness, noting that "[a]bsence from the proceedings is deficient performance as a matter of law"), *vacated on other grounds*, 484 U.S. 806 (1987), *reinstated* 839 F.2d 300 (6th Cir. 1988); *Burdine v. Johnson*, 262 F.3d 336, 349 (5th Cir. 2001) (en banc) (explaining that where defense counsel was asleep during a substantial portion of Burdine's trial, a determination of per se prejudice was appropriate because "[u]nconscious counsel does not analyze, object, listen or in any way exercise judgment on behalf of a client"); *see also Tippins v. Walker*, 77 F.3d 682, 687 (2d Cir. 1996) ("[T]he buried assumption in our *Strickland* cases is that counsel is present and conscious to exercise judgment, calculation and instinct, for better or worse. But that is an assumption we cannot make when counsel is *unconscious* at critical times.") (emphasis added).

Modelski's performance as counsel, good or bad, was clearly not the equivalent of being physically or mentally absent as in the above-cited cases. This requires us to evaluate her performance under the *Strickland* standards, not

from Modelski's failure to cross-examine these witnesses that raises the specter of prejudice *per se. See French v. Jones*, 282 F.3d 893, 900 (6th Cir. 2002) ("The uncertainty of the prejudice [the defendant] suffered because he was not represented by counsel during this critical stage of his trial makes the outcome of his trial unreliable."). Modelski's failure to cross-examine either of these two witnesses – particularly when her alleged trial strategy was to illustrate the inherent unbelievability of their testimony – demonstrates the presumptive prejudice spoken of in *Cronic* because it calls the reliability of the trial outcome into question. Modelski's physical presence in the courtroom, albeit while she was apparently conscious, does nothing to change this result. *See id.* at 899 (rejecting the argument that "an error during trial only requires automatic reversal when a defendant has suffered a total deprivation of counsel").

This Court's decision in *Green v. Arn*, 809 F.2d 1257 (6th Cir. 1987), *vacated on other grounds*, 484 U.S. 806 (1987), *reinstated* 839 F.2d 300 (1988), directly supports this conclusion. In *Green*, a habeas petitioner claimed that she was denied her Sixth Amendment right to the effective assistance of counsel because her counsel was absent during the afternoon of the first day of trial, during which the state's first witness, victim Maureen McNea, was cross-examined by the attorney for the two other co-defendants with whom Petitioner was tried. *See id.* at 1259. Petitioner's counsel was present in the morning for the cross-examination, but was absent for a portion of the afternoon session because he was attending a jury sentencing hearing in a capital case in another courtroom on behalf of a different client. *Id.* at 1259-60. When counsel for the co-defendants finished his cross-examination of the victim, counsel looked to the court for guidance as to how to proceed inasmuch as Petitioner's counsel was absent at that point. *Id.* at 1260. The court responded:

> Let the record reflect the Court, in anticipation of this problem with Mr. Carlin [Petitioner's counsel], discussed it with him prior to lunch break, and he informed me that

which would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." *Cronic*, 466 U.S. at 659 (internal quotation marks and citations omitted).

That is not to say that a defense counsel's decision not to cross-examine a witness will in every case rise to the level of a presumption of ineffectiveness. However, the failure to do so in this case does raise a presumption of prejudice where Petitioner was on trial for first-degree murder, Freeman's testimony constituted an admission to the killing by Petitioner, Modelski failed to interview Freeman, and where Freeman's testimony may have been discredited through effective cross-examination. For example, through effective cross-examination, Modelski may have discredited Freeman's testimony by showing the distance from which Freeman was from the crime scene, the time of day and noise level in the community, or how Freeman may have been confused by the goings on such that it may have been Thomas who made the incriminating statement, particularly since Freeman had been drinking and Thomas was fleeing with Petitioner. Along this line, if Modelski had interviewed Freeman she may have been able to uncover other valuable information to cast doubt upon his very damaging testimony. For example, Freeman may, in fact, be hearing impaired, but because Modelski failed to conduct an investigation into Freeman's testimony for the purpose of cross-examination, that or any other discrediting fact was not made known to the jury. Petitioner, therefore, was denied his right to effective cross-examination by counsel's inactions thereby giving rise to a presumption of prejudice.

The majority disagrees with the finding that Modelski's failure to cross-examine either of these key witnesses for the prosecution gives rise to a presumption of prejudice, claiming that the finding is based on "supposition" or "speculation" that the cross-examination would have proven beneficial. However, the majority misses the point behind presuming prejudice in a criminal case. It is the very uncertainty, or "speculation" if you will, as to the degree of prejudice gleaned

under the *Cronic* rule of per se prejudice. Moreover, because Modelski's actions and inactions reflected strategic choices that she made after engaging in pretrial preparation, we find hyperbolic the dissent's assertion that our position "appears to come down to a finding that so long as counsel is physically present during trial and conscious, ineffective assistance of counsel per se cannot be found." Dissent. Op. at 35.

We also believe that the dissent's emphasis on the inherent unreliability of eyewitness testimony is misplaced given the facts of the present case. The primary concern expressed in cases discussing the problems with eyewitness identification relates to a witness observing and subsequently identifying a *stranger*. *Manson v. Brathwaite*, 432 U.S. 98, 111-12 (1977) (discussing previous Supreme Court cases focusing on the risks of eyewitness identification, noting that "[u]sually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress"); *United States v. Wade*, 388 U.S. 218, 228 (1967) (noting that Justice Frankfurter once remarked that "[t]he identification of strangers is proverbially untrustworthy"); *Jackson v. Fogg*, 589 F.2d 108, 112 (2d Cir. 1978) ("Centuries of experience in the administration of criminal justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness [are] highly suspect."). The present case does not present such a situation. Purdie, the witness who testified that she observed Moss shoot Manley, saw him on a daily basis as a person in the neighborhood. This case is simply not the "stranger who jumps out of the dimly lit alley" situation that would raise reasonable doubts about Purdie's perception.

Finally, although the dissent maintains that it does not advocate finding prejudice per se in every case where defense counsel relies upon the cross-examination conducted by counsel for a codefendant, we believe that would be the practical effect of its analysis whenever a key state witness takes the stand. We do not believe this to be the current state of the law as declared by either the Supreme Court or by the

prior decisions of this court. *Compare Green*, 809 F.2d at 1263 (applying *Cronic*'s rule of per se prejudice in a case where defense counsel, after being physically absent from the courtroom during the cross-examination of a key government witness, relied solely upon the cross-examination conducted by codefendant's counsel) *with Groseclose v. Bell*, 130 F.3d 1161, 1169-70 (6th Cir. 1997) (recognizing that *Cronic*'s irrebuttable presumption of prejudice might be appropriate, but deciding to apply the case-by-case evaluation under *Strickland* despite the fact that counsel lacked any trial strategy, failed to conduct a meaningful adversarial challenge, and relied upon decisions made by the codefendant's counsel in a case where the defendants had antagonistic defenses); *see also Warner v. Ford*, 752 F.2d 622, 625 (11th Cir. 1985) ("Silence can constitute trial strategy. Whether that strategy is so defective as to negate the need for a showing of prejudice to establish ineffective assistance of counsel must be judged on a case-by-case basis.").

Moss argues that his counsel provided ineffective assistance because she failed to make an opening statement, to cross-examine Freeman and Purdie, to pursue a theory that Thomas was the sole shooter, to call any defense witnesses, to make any objections, or to present a stronger closing argument. Each of these claims is addressed below pursuant to *Strickland*'s requirements.

### 1.   Counsel's failure to make an opening statement

Moss first contends that his counsel's failure to make an opening statement was both objectively unreasonable and prejudicial. Although Modelski reserved her right to make an opening statement, she never exercised this right. Furthermore, Modelski testified that she could not remember whether she had made an opening statement, but that it would be unusual for her not to do so.

A trial counsel's failure to make an opening statement, however, does not automatically establish the ineffective assistance of counsel. *United States v. Haddock*, 12 F.3d 950, 955 (10th Cir. 1993) (holding that defense counsel's decision

trial, as opposed to her inactions. For example, in finding that a presumption of prejudice is not warranted in this case, the majority notes several actions taken by Modelski prior to trial, such as attending the preliminary examination and encouraging Petitioner to accept the government's guilty plea. Modelski's constructive absence at the preliminary phase of the criminal proceedings, however, is not at issue. And, in any event, it has been found that a harmless error analysis should be applied when considering counsel's absence at the preliminary hearing stage of the proceedings. *See, e.g., Coleman v. Alabama*, 399 U.S. 1, 10-11 (1970); *Takacs v. Engle*, 768 F.2d 122, 124 (6th Cir. 1985); *McKeldin v. Rose*, 631 F.2d 458, 460 (6th Cir. 1980) (*per curiam*). The majority also makes note of the fact that during trial, Modelski "reserved her right to make an opening statement, cross-examined witnesses, and made a closing argument." Once again, however, the majority misses the mark inasmuch as it is Modelski's *inactions* at trial, or more specifically her inactions during a critical stage of the trial, that give rise to a presumption of prejudice. *See Cronic*, 466 U.S. at 659.

In this regard, Modelski failed to cross-examine James Freeman and Nicole Purdie, both key witnesses for the prosecution. According to Modelski's testimony at the evidentiary hearing, although her trial strategy was based on raising a reasonable doubt as to the credibility of these key witnesses, she made a deliberate choice not to cross-examine either of them. Her alleged basis for her decision not to cross-examine Freeman was that his testimony – that he overheard Petitioner confess to killing a man as Petitioner fled from the scene – was inherently unbelievable, and that any cross-examination would have drawn additional attention to the testimony. Modelski's decision not to cross-examine Freeman constructively denied Petitioner his right to counsel at a critical stage in the proceedings, and "fail[ed] to subject the prosecution's case to meaningful adversarial testing . . . ." *Cronic*, 466 U.S. at 659. Indeed, as the Supreme Court opined, "[n]o specific showing of prejudice was required in *Davis v. Alaska*, 415 U.S. 308 (1974), because the petitioner had been denied the right of effective cross-examination

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting. Because I find counsel's performance so deficient that it denied Petitioner his Sixth Amendment right to counsel at a critical stage of his trial, and failed to subject the prosecution's case to meaningful adversarial testing, I part company with the majority, and would grant Petitioner's application for a writ of habeas corpus on the basis of ineffective assistance of counsel *per se*. In the alternative, however, even when subjected to a harmless error analysis under *Strickland v. Washington*, 466 U.S. 668 (1984), I believe that Petitioner has demonstrated prejudice sufficient for the writ to issue.

### A. Modelski's Performance was Presumptively Prejudicial

The Supreme Court has guided us that when considering a claim of ineffective assistance of counsel, there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Cronic*, 466 U.S. 648, 658 (1984). As the majority accurately states, the Court defined such circumstances as when counsel was either totally absent or otherwise failed to assist the accused during a critical stage of the trial; when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing; or when the surrounding circumstances make it unlikely that even though counsel may be available to assist the accused during trial, any lawyer, even a competent one, could provide effective assistance. *Id.* at 659-60 & nn.25, 26. Unlike the majority, however, I believe that the circumstances of this case fall within the bounds of those described by the Supreme Court such that prejudice may properly be presumed.

A fundamental flaw in the majority's analysis of this claim is that it focuses on Modelski's actions before and during

not to present an opening statement because he did not know what Haddock would say on the witness stand was not constitutionally deficient performance); *United States v. Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th Cir. 1985) ("The timing of an opening statement, and even the decision whether to make one at all, is ordinarily a mere matter of trial tactics and in such cases will not constitute the incompetence basis for a claim of ineffective assistance of counsel."); *United States v. Salovitz*, 701 F.2d 17, 20-21 (2d Cir. 1983) (noting that trial counsel's decision to waive an opening statement is often a matter of trial strategy "and ordinarily will not form the basis for a claim of ineffective assistance of counsel").

In the present case, Gould's counsel made an opening statement in which he discussed issues that applied to both Gould and Moss, such as the burden of proof and the credibility of witnesses. Modelski's decision not to make an opening statement at that point prevented her from having to disclose her trial strategy before the government presented its case. *Williams v. Beto*, 354 F.2d 698, 703 (5th Cir. 1965) (noting that trial counsel's decision not to make an opening statement "was a matter of professional judgment, and . . . was very likely the wiser course to follow" because of the strong case against the defendant). Furthermore, an opening statement was unnecessary at the conclusion of the government's proof, because Modelski did not offer any evidence or present any witnesses. *See Lewis v. United States*, 11 F.2d 745, 747 (6th Cir. 1926) (noting that "an opening statement should not have been made by counsel, if he did not expect to introduce evidence tending to substantiate it").

Even if this decision was not a strategic one, Moss has not articulated how the absence of an opening statement prejudiced him. Moss's conclusory allegations are insufficient to justify a finding that an opening statement would have created the reasonable probability of a different outcome in his trial. *Nguyen v. Reynolds*, 131 F.3d 1340, 1350 (10th Cir. 1997) (holding that "[d]efense counsel's

failure to make an opening statement was nothing more than a tactical decision that did not adversely affect Nguyen"). We therefore conclude that Modelski's failure to make an opening statement did not constitute a constitutionally deficient performance.

### 2.  *Counsel's failure to cross-examine key witnesses*

As the second basis for his ineffective-assistance-of-counsel claim, Moss focuses on his counsel's failure to cross-examine Freeman and Purdie. Moss contends that his counsel could have attempted to impeach Freeman's credibility by exploring the possibility that Freeman misidentified Moss, emphasizing Freeman's testimony that he had been drinking when he saw Moss and Gould run by his apartment.

With regard to Purdie, Moss argues that his counsel should have cross-examined Purdie on several grounds. First, he contends that her testimony was inconsistent, because she testified that she could not see Manley after he fell, yet claims that she saw Manley moving on the ground and attempting to get up. She further claimed that Moss stood directly over Manley and shot him. Second, Moss argues that Purdie's account conflicts with the medical examiner's testimony, which was introduced at the preliminary hearing, that no evidence of close-range firing existed. Moss next claims that his counsel could have cross-examined Purdie about the accuracy of her identification of Moss, given that Moss and Thomas allegedly resemble each other. Finally, Moss contends that his counsel failed to explore Purdie's possible bias, based on Purdie being a friend of Manley but only an acquaintance of Moss.

Modelski's testimony at the evidentiary hearing indicates that her decision not to cross-examine Freeman was a strategic choice. She considered his testimony to be inherently unbelievable and thought that cross-examination would simply focus additional attention on Moss's alleged admission. Although other attorneys might have reached a different conclusion about the value of cross-examining Freeman, Modelski's decision was "within the wide range of

constitutes the ineffective assistance of counsel. Nor does the brevity of Modelski's closing argument, which Moss also challenges, establish constitutionally deficient performance. Finally, unlike the facts in *Groseclose*, the state's evidence against Moss was quite strong in light of the testimony of the two eyewitnesses.

Moss has thus failed to demonstrate that his counsel's performance in these respects was objectively unreasonable. In addition, because Moss's allegations are conclusory, he is unable to show a reasonable probability that the result of his trial would have been different even if his counsel had performed in some other manner. We therefore conclude that Moss failed to establish an ineffective-assistance-of-counsel claim based upon the contention that his counsel did not present a significant adversarial challenge.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

the defense counsel's performance that made his representation objectively unreasonable:

> (1) his failure to have any defense theory whatsoever; (2) his failure to conduct any meaningful adversarial challenge, as shown by his failure to cross-examine more than half of the prosecution's witnesses, to object to any evidence, to put on any defense witnesses, to make a closing argument, and, at sentencing, to put on any meaningful mitigation evidence; and (3) perhaps most importantly, his abdication of his client's case to [his co-defendant's] counsel.

*Id.* at 1169.

In addition to finding this performance deficient, the *Groseclose* court concluded that a reasonable probability existed that the outcome would have been different if the defendant had received effective representation because "[t]he State's evidence tying Groseclose to the perpetrators of the murder was relatively weak." *Id.* at 1170. The court also emphasized that if defense counsel had presented mitigating evidence at the sentencing phase of the trial, a reasonable probability existed that the death sentence would not have been imposed. *Id.* at 1170-71.

Moss contends that, like the defense counsel in *Groseclose*, his counsel failed to conduct a meaningful adversarial challenge. The problem with Moss's argument, however, is that he does not identify any witnesses that his counsel should have called or objections that she should have made. *United States v. Murray*, 751 F.2d 1528, 1535 (9th Cir. 1985) (rejecting the defendant's claim that his trial counsel provided ineffective assistance, noting that the defendant did "not identify any witnesses that his counsel should have called that could have been helpful"). Although Moss contends that Modelski's closing argument was deficient because she stated that "there is more than reasonable doubt" about Moss's guilt, this statement would have resulted in an acquittal for Moss if the jury had believed it. Contrary to Moss's belief, therefore, it does not represent a concession of Moss's guilt that

reasonable professional assistance." *Strickland*, 466 U.S. at 689. Indeed, her strategic choice is "virtually unchallengeable" because she made it after considering the relevant law and facts. *Id.* at 690 (noting that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). We therefore conclude that Modelski's decision not to cross-examine Freeman did not constitute a constitutionally deficient performance.

The dissent reaches the opposite conclusion. In doing so, the dissent speculates as to possible lines of cross-examination, including the possibility that Freeman might have had hearing problems. The dissent's position that cross-examination might have led to a different outcome at trial is similarly speculative because Moss did not provide any evidence that Freeman would have testified any differently even if Modelski had cross-examined him. We believe that the dissent's reliance upon hypotheticals contradicts *Strickland*'s admonition against second-guessing the performance of counsel. *Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . . Even the best criminal defense attorneys would not defend a particular client in the same way.") Moreover, we disagree with the dissent's implication that the only way to discredit a witness is through cross-examination. Finally, we believe that the dissent fails to take into account the potential risk of having the damaging testimony repeated during cross-examination, a risk which could easily outweigh the possibility of identifying weaknesses in the witness's account.

Modelski's decision not to cross-examine Purdie presents a more difficult question. Although Modelski believed that cross-examination was unnecessary because Gould's counsel

had cross-examined Purdie, a strong likelihood exists that Moss and Gould would have benefitted from different trial strategies. In fact, Purdie testified that she did not see Gould at the scene of the crime. Gould's counsel would therefore have had no incentive to challenge Purdie's credibility. As a result, Modelski's decision not to cross-examine Purdie was not a reasonable strategic decision entitled to deference. *See Groseclose v. Bell*, 130 F.3d 1161, 1170 (6th Cir. 1997) (concluding that defense counsel's decision to defer completely to codefendant's counsel was deficient performance given the defendants' antagonistic defenses and the poor performance of the latter's attorney).

This determination, however, does not compel the conclusion that Modelski's decision not to cross-examine Purdie constituted constitutionally ineffective assistance. First, regardless of any inconsistencies in Purdie's testimony concerning her ability to see Manley after he fell to the ground, she unequivocally stated that she could see Moss "very clearly," and she unhesitatingly identified Moss as the shooter at both the preliminary hearing and at trial. Moss also fails to explain what questioning Purdie about the alleged inconsistencies would have accomplished. As the magistrate judge noted, Purdie might have clarified her account, and her testimony would almost certainly have led to repetition of the most damaging testimony in the trial—that Purdie saw Moss shoot Manley.

Moss's reliance on the medical examiner's testimony to expose inconsistencies in Purdie's testimony is similarly misplaced. In addition to the fact that Moss does not present a definition of close-range firing, Purdie might have easily explained any discrepancy between her testimony and the medical examiner's report. For these reasons, failing to cross-examine Purdie in an attempt to expose the inconsistencies in her testimony did not establish "a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Moss's testimony at the evidentiary hearing raises additional doubts about Thomas's credibility. According to Moss, Thomas was the first person to flee, and Moss, Gould, and Vaught remained at the scene of the crime for a minute before beginning to run. No one else, other than the victim, was present at the scene of the crime. As a result, Moss's testimony conflicts with Thomas's statement that an unidentified person accompanied Thomas as he fled.

We find no reason to substitute our judgment for the credibility determination of the magistrate judge who had the opportunity to observe Thomas's testimony and assess his demeanor on the witness stand. *See Peveler v. United States*, 269 F.3d 693, 702 (6th Cir. 2001) (refusing to second-guess the credibility determination of the magistrate judge, and noting the general reluctance of this court "to set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness on the stand and assess his demeanor").

Given that Thomas would have been subject to impeachment if he had testified at Moss's trial, and that the magistrate judge found Thomas to lack any credibility, no reasonable probability exists that the result at trial would have been any different if Moss's counsel had interviewed Thomas prior to trial and then called him as a witness. We thus conclude that Moss failed to establish an ineffective-assistance-of-counsel claim based upon his counsel's failing to investigate or pursue a theory that Thomas was the sole shooter.

### 4.   *Miscellaneous allegations*

At various points in his briefs, Moss contends that his counsel was ineffective because she failed to call any defense witnesses, made no objections, and gave a short closing argument. Moss relies on *Groseclose v. Bell*, 130 F.3d 1161, 1169-71 (6th Cir. 1997), to support his position. Despite Moss's argument, *Groseclose* is distinguishable from the present case. The *Groseclose* court identified three aspects of

as a witness because Moss is unable to satisfy *Strickland*'s second requirement of establishing prejudice. Our conclusion that no prejudice would be shown is premised on (1) the fact that the prosecutor could have thoroughly impeached Thomas with his contrary statements given first to the police and later at his guilty plea proceeding, and (2) the magistrate judge's determination that Thomas's testimony at the evidentiary hearing lacked credibility.

As we noted above, Thomas's claim that he fired all of the shots directly conflicts with the statements that he made to the police and at his guilty plea hearing. The prosecutor would therefore have been able to impeach Thomas if he had testified that he was the sole shooter.

Moreover, the magistrate judge who conducted the evidentiary hearing found Thomas's testimony to be "totally unworthy of belief." The magistrate judge based this finding on (1) the inconsistencies in Thomas's testimony at the evidentiary hearing, (2) the multiple, conflicting accounts of Manley's shooting that Thomas has given, and (3) the lack of any reason for the police officers to pressure Thomas into altering his account of the crime given that his alleged initial statement—that he fired all of the bullets in the gun—demonstrated a willingness to accept complete responsibility for the crime. Furthermore, the magistrate judge pointed out the numerous discrepancies between the affidavit that Thomas signed after the trial and his evidentiary hearing testimony. In particular, Thomas testified at the evidentiary hearing that he could not recall where Moss was standing after the shooting, that Thomas was accompanied by an unidentified person as he ran from the scene, and that he had told this person on the run that he had killed someone. Thomas's affidavit, in contrast, includes his declaration that he saw Moss standing in shock at the scene of the crime, contains no reference to someone running from the scene with him, and fails to acknowledge making a statement admitting his guilt as he fled.

The second line of questioning that Moss contends his counsel should have pursued—an attack on the accuracy of Purdie's identification of Moss—also fails to establish a reasonable probability of a different outcome. Purdie testified that she saw Moss on a daily basis and she identified him at trial. She further identified him at the preliminary hearing where both Moss and Thomas were present.

Finally, Moss challenges Modelski's failure to cross-examine Purdie regarding her possible bias. But as the magistrate judge noted,

> Purdy's [sic] acquaintance with both the victim and Moss were explored in her direct testimony and in her cross-examination by [Gould's counsel]. Repetition of that testimony on cross-examination by Modelski is unlikely to have yielded evidence of bias. Moss does not offer any fact that was not introduced at trial and which would suggest that Purdy's [sic] testimony was influenced by her relationship with any person. Mere speculation that such influence existed is insufficient to warrant serious consideration.

The magistrate judge's analysis thoroughly addresses Moss's claim and indicates that cross-examining Purdie about her potential bias would not have created a reasonable probability of a different outcome in Moss's trial.

In contrast to our conclusion, the dissent believes that Modelski's failure to cross-examine Purdie constituted deficient performance and was prejudicial to Moss. To the extent that the dissent relies upon the inherent unreliability of eyewitness testimony to establish prejudice, we have already explained why we do not agree with this reasoning. We also disagree with the dissent's position that relying on the testimony of two eyewitnesses as an indication of the strength of the government's case against Moss conflicts with our conclusion that failing to cross-examine Purdie was harmless error. In our view, the problem with the dissent's reasoning is that it relies upon speculation regarding the potential benefits of cross-examination. Such possibilities do not

constitute "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

For all of the reasons stated above, we conclude that Modelski's decision not to cross-examine Purdie did not violate Moss's Sixth Amendment right to the effective assistance of counsel. And even if his counsel's performance was deficient, Moss has failed to establish a reasonable probability that the outcome of his trial would have been different if Modelski had cross-examined Purdie.

### 3.   *Counsel's failure to pursue a particular defense theory*

Moss next argues that his counsel's failure to investigate and pursue a theory that Thomas was the only person who shot Manley constitutes ineffective assistance. According to Moss, if his counsel had interviewed Thomas, called him as a witness, and elicited testimony that he fired all of the bullets, the result in this case would likely have been different.

Moss's contention overlooks the fact that, according to Modelski, she had no reason at the time of trial to believe that Thomas was the sole shooter. She testified that Moss repeatedly told her that Gould had fired the gun after Thomas fled, and that she did not remember Moss informing her that Thomas also shot Manley. Although Moss testified at the evidentiary hearing that he had told Modelski that Thomas fired the gun, this testimony does not necessarily conflict with Modelski's account of what Moss told her. Moss's testimony at the evidentiary hearing does not clearly establish that he told Modelski prior to trial that Thomas was the *sole* shooter. It is conceivable that Moss told Modelski that both Thomas and Gould fired the gun. Modelski's trial strategy of attempting to raise doubts about the circumstances of Manley's shooting would be consistent with this possibility, and it might explain why she did not recall Moss telling her that Thomas also shot Manley.

Moss's argument that his counsel should have conducted an independent investigation into Thomas's account of the shooting does not alter our analysis. Although "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary[,] . . . [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691. Modelski testified that Moss told her that Gould fired the gun after Thomas fled. Assuming this to be true, Moss cannot now challenge his counsel's failure to pursue a theory that Thomas fired all of the bullets. *Id.* (noting that "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable").

Even if the record clearly supported the fact that Moss had told Modelski from the beginning that Thomas was the sole shooter (which it does not), we doubt whether this would establish that Modelski's performance was constitutionally deficient. Thomas, after all, had made statements to the police and at his guilty plea hearing that he had fired only two shots, and that someone else also shot Manley. It is therefore highly unlikely that Thomas would have given a different account of Manley's shooting even if Modelski had interviewed him or had called him to testify at trial.

A different attorney might have seized upon the existence of this remote possibility if Moss had indeed claimed at the time that only Thomas shot Manley. Modelski's failure to do so, however, must be evaluated under the circumstances she faced and in light of her trial strategy. Concluding that Modelski's performance in this respect was deficient would approach and perhaps constitute impermissible second-guessing of her decision not to interview Thomas.

Regardless of what Moss actually told Modelski prior to trial, he cannot base his ineffective-assistance-of-counsel claim on Modelski's failure to interview Thomas or call him