Alton HIGGINS, Petitioner,

v.

Paul RENICO, Respondent.

No. 02–10124–BC.

United States District Court,
E.D. Michigan,
Northern Division.

March 29, 2005.

Alton Higgins, Ionia, MI, pro se.

Brenda E. Turner, William C. Campbell, Lansing, MI, for Respondent.

### OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS

LAWSON, District Judge.

The petitioner, Alton Higgins, a state inmate currently incarcerated at the Bellamy Creek Correctional Facility in Ionia,

Michigan, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his convictions for first-degree felony murder, Mich. Comp. Laws § 750.316, and possession of a firearm in the commission of a felony (felony firearm), Mich. Comp. Laws § 750.227b. Although Higgins raises several issues, the Court finds that only one warrants relief: his trial attorney was constitutionally ineffective because he failed to cross-examine the key prosecution witness, and this substandard performance substantially prejudiced Higgins' defense. The other errors cited by the petitioner were either procedurally defaulted or lack merit. However, because of the Sixth Amendment violation, which the state courts did not fully address in a reasoned opinion, the Court will conditionally grant the petition for writ of habeas corpus, allowing the State a reasonable time to retry the petitioner if it so chooses.

## I.

Higgins was one of three other people in an automobile parked in a Detroit neighborhood in April 1995 when negotiations for the sale of a firearm turned violent. The driver of the vehicle and seller of the handgun, Alvin Ramsey, was shot to death as he was sitting in the driver's seat of the car. One of the occupants, Michael Adams, exited the vehicle and fled on foot before shots were fired, leaving petitioner Higgins, Ramsey, and Wayne Young in the vehicle. After Ramsey was shot, Higgins made a statement to the police implicating Young as the shooter. Young accused Higgins of firing the fatal shot. The police arrested Higgins, and Young testified against him at trial as the only eyewitness to the shooting.

## A.

The killing took place on April 3, 1995. The next day, Sergeant Ralph Openshaw of the Detroit Police Department questioned petitioner Higgins about the shooting. Higgins did not testify on his own behalf at trial, but Sergeant Openshaw related Higgins' statement to the jury. Higgins told Openshaw that on April 3, 1995, he, Wayne Young, Michael Adams, and some other friends were sitting on a front porch discussing guns when Young stated that Alvin Ramsey, who was sitting in a car on the street in front of them, had guns. Young then approached the car to talk to Ramsey. Moments later, Higgins also approached the car and got into the rear passenger seat. Ramsey told Higgins and Young that he had a gun at his house that he would sell to them. Higgins said he then got out of the car and returned to the porch. Young returned to the porch and said he was going to try to give Ramsey some cocaine for the gun, but since he did not have any cocaine he would give Ramsey soap powder that he would attempt to pass off as cocaine.

Higgins then stated to Openshaw that he and Young walked to Ramsey's house where Ramsey showed them a .25 caliber handgun, and said he would sell it for $75 dollars. Higgins told Ramsey that they only had $40 or $50. Young then offered to give Mr. Ramsey some money and some cocaine as payment. Mr. Ramsey told them he thought they could work something out.

According to Higgins, he and Young then walked back to the porch where their friends were waiting. Young told the friends he was going to purchase the gun for money and cocaine. His friends encouraged him to use soap instead of actual cocaine. Young said he noticed that Ramsey had a gun in his waistband. A friend said he had a gun too, and gave Young a .45 caliber or .9 mm handgun. Higgins said that he and Young then returned to Ramsey's house. They asked Ramsey to fire the gun to ensure that it worked; it

did. It began raining, so Ramsey, Young, and Higgins got into Ramsey's car. The men negotiated the price of the gun. Higgins handed Ramsey $50, but Ramsey insisted on $10 more, so Ramsey drove the men to the porch where Higgins retrieved ten dollars and returned to the car. Ramsey then drove back to his own house where Young gave Ramsey the money. Ramsey then gave them the gun but said he would give them the clip when they got out of the car. Young then asked Ramsey to drive down the street. According to petitioner Higgins, as Ramsey drove down the street Young took a gun from his coat and said, "We want everything you got." Higgins told Sergeant Openshaw that he jumped out of the car, then heard two shots. He saw the car hit a van parked on the side of the street.

Wayne Young's version of the incident conflicted with the petitioner's on the critical fact of who shot Ramsey. Young apparently returned to the scene on the day of the shooting, surrendered to the police, admitted to being present in the car with Ramsey, and denied that he was the one who fired the shots. Young testified at the petitioner's preliminary hearing and implicated him as the shooter. That testimony was read into the record at trial when Young failed to appear on the day he was subpoenaed to testify. However, Young did present himself at trial two days later and testified for the prosecution.

Young told the jury that on the afternoon of April 3, 1995, he, Higgins, Michael Adams, and several other friends were sitting on a friend's front porch when they decided that they were going to purchase a gun from Ramsey. Young testified that he tried to purchase the gun with soap, which he pretended was cocaine, but Ramsey said he would not accept the "cocaine" in exchange. Young testified that he then got into the front passenger seat of Ramsey's car, Adams got into the back seat behind him, and Higgins got into the back seat behind Ramsey.

According to Young, petitioner Higgins gave Ramsey the money, and Ramsey handed Higgins a .25 caliber handgun. Higgins saw that Ramsey also had a .32 caliber handgun in his waistband, whereupon Higgins pulled out a .45 caliber handgun, pointed it at Ramsey, and told Ramsey to give him the .32. Young testified that Ramsey then tried to get out of the car, but Higgins shot him before he could escape. Adams ran from the car before any shots were fired. Young said he was getting out of the car when he heard the first shot, and was running away from the car when he heard a second shot. Young testified that he was wearing a green jacket that day.

Michael Adams also testified at trial and denied having virtually any knowledge of the shooting of Mr. Ramsey. In fact, he said that he was at home with his mother when Ramsey was shot. The prosecutor impeached him with a prior inconsistent statement to police in which he stated that he was in the car with Young and Higgins during the gun purchase transaction, that he was getting out of the car when he saw Higgins reach into his coat, and as he was running away from the car he heard two gunshots.

Other witnesses at the scene testified that they heard two gunshots and saw Ramsey's car roll into a blue truck that was parked at the curb. Some of the witnesses observed two people run from the scene, one tall man wearing a green jacket and another, shorter man wearing a brown jacket. The witnesses saw that Ramsey was injured and part of his body was hanging from the driver's door of his car; he was clutching money in his hand. An assistant medical examiner testified that Ramsey died of a gunshot wound to the back of his neck. There was no evi-

dence that the shot was fired from close range. A forensic chemist from the Detroit Police Department crime laboratory testified that both Wayne Young and deceased Alvin Ramsey had gunshot residue on their hands, but no tests were performed on the petitioner.

The petitioner was represented at trial by attorney Walter Pookrum. Apparently, Mr. Pookrum did not anticipate Young's late appearance at trial and, since Young's preliminary hearing testimony had been read to the jury two days earlier, Pookrum failed to prepare for his cross-examination. After Young's direct testimony was finished, the following exchange took place between the trial judge and Mr. Pookrum:

> The Court: ... Mr. Pookrum said he wanted to prepare for his cross-examination [of Mr. Young] ... just let me know when you're ready. I want to keep the continuity so we won't have to have this same kind of situation we had yesterday.
>
> Mr. Pookrum: I would like at leas[t] a half hour.
>
> The Court: No. You sat here all morning, Mr. Pookrum, and you heard that witness testify. You heard—you know what his testimony is going to be. You had heard it from this examination and, no, I'm not going to do that. You asked for five minutes.
>
> Mr. Pookrum: I didn't ask for five minutes.
>
> The Court: I think I have given you sufficient time. You heard the witness testify. We don't stop after every witness testifies to give anybody prepared for cross-examination.
>
> Mr. Pookrum: We're not talking about after every witness, we're talking about this witness.
>
> The Court: No, we're going to proceed, Mr. Pookrum.
>
> Mr. Pookrum: Well, I'm not ready, so—

> The Court: Well, we are going to continue with the trial. I think under the circumstances since this witness' testimony has been recorded, his testimony wasn't that long. He stated almost exactly the same thing that he had stated before, that is on the record. There's nothing surprising about what he said and under the circumstances I think defense counsel has had ample time to prepare, and I'm not cutting him short. I don't see how I can be accused of that. I did send the jury out to give you time but I'm not going to delay the trial.
>
> . . .
>
> Mr. Pookrum: I just wanted to remind Your Honor that I have informed you before in connection with the use of this man's testimony that I as of the start of this trial and even today don't have the two statements that he supposedly gave to the police.
>
> Now, I refer to them because the, apparently, I really can't even say this for sure, apparently because the attorney Jeff Edison who asked me to represent Mr. Higgins at the exam briefed me somewhat on what had occurred and what the potential issues were, and that's why I asked him about giving the two statements. But the week-as of the week before this trial started, and Ms. Westveld will bear this out, I called her and left a message on her voice mail and talked to her secretary asking her for both statements of both Michael Adams and Wayne Young, and she was on vacation. . . .
>
> The Court: Do you have a statement from this?
>
> Prosecutor: I gave him my two statements from Wayne Young two days ago. I gave him mine.

Mr. Pookrum: What I'm saying is because he wasn't here and because we didn't expect to see him, I have not prepared for the cross-examination of this person. Now that's what I'm saying.

The Court: Okay. We'll reconvene this matter at 10:30. It is now 10:15. You've had those statements for two days. The gentleman, again, has testified at an examination which is available. You have the statement, he's testified this morning, just five minutes ago. We will adjourn now until 10:30 so you can go over the statement. I don't think I'm being unreasonable.

. . .

The Court: The record will indicate that we stopped at 10:15 and it is now 10 minutes to 11.

Go ahead, Mr. Pookrum.

Mr. Pookrum: Your Honor, I would ask for the Court to give me at least until after the lunch hour. I'm still working on Mr.—

The Court: Bring out the jury. Denied. You asked me for a half hour, I gave you 35 minutes.

Mr. Pookrum: May I say this for the record? I'm still working on the first statement that Mr.—

The Court: I understand . . .

Mr. Pookrum: I'm still reading and writing questions based on the first statement that Mr.—

. . .

The Court: . . . bring the jury out.

Mr. Pookrum: Well, I'm not ready to cross-examine this man.

The Court: If you don't, I'll excuse the witness.

Mr. Pookrum: It will be malpractice for me to proceed.

The Court: It might be.

Mr. Pookrum: Well, I'm not ready.

The Court: Okay.

Tr., Vol. IV, at 52–57.

The jury then returned to the courtroom. Mr. Pookrum stated that he was not prepared to cross-examine the witness, and the court excused Mr. Young.

No defenses witnesses were called to testify. After instructions, the jury found the petitioner guilty of first-degree felony murder, armed robbery, and felony firearm. On April 3, 1996, the petitioner was sentenced to concurrent terms of life imprisonment for the first-degree murder and armed robbery convictions, and two years imprisonment for the felony-firearm conviction.

### B.

The petitioner filed a direct appeal through appointed counsel in the Michigan Court of Appeals, raising the following issues:

I. Did the trial court abuse its discretion by refusing to give accomplice instructions?

II. Did the trial court commit error by permitting the introduction of fear testimony by accomplice Adams which was unconnected to the defendant?

III. Do principles of double jeopardy preclude the imposition of punishment for both felony murder and its predicate felony?

The petitioner, through new appellate counsel, then filed a motion to remand so that he could file a motion in the trial court for a new trial on the basis of an affidavit by Wayne Young in which Young allegedly recanted his trial testimony. The new appellate attorney also filed a supplemental brief raising the following additional issues:

IV. The trial court's comments and denigration of defense counsel

pierced the veil of impartiality, and denied Mr. Higgins a fair trial by an impartial jury.

V. The trial court's refusal to give an accessory after the fact instruction, which was requested and supported, was error which deprived Mr. Higgins of a fair trial and due process of law.

VI. Trial counsel's lack of preparation and refusal to cross-examine the prosecution's key witness deprived Mr. Higgins of the effective assistance of counsel and a fair trial.

The court of appeals granted the motion to remand and retained jurisdiction, ordering the trial court to make findings of fact and a determination on the record in adjudicating the petitioner's motion for new trial. *People v. Higgins,* No. 195865 (Mich.Ct.App. Feb.23, 1998). However, on the date set for the motion hearing in the trial court, Young failed to appear. The petitioner's attorney stated that he had contacted Mr. Young several times prior to the hearing date and that Mr. Young appeared to be "recanting his recantment." Tr. 3/11/98 at 4. The trial court dismissed the motion for a new trial. The state court of appeals then affirmed the petitioner's felony murder and felony firearm convictions but vacated his conviction and sentence for armed robbery. *People v. Higgins,* No. 195865, 1999 WL 33451714 (Mich.Ct.App. March 30, 1999).

The petitioner then filed a delayed application for leave to appeal in the Michigan Supreme Court, raising the same claims presented to the Michigan Court of Appeals, and the following additional claim:

VII. It was error for the trial judge to rule on defendant's statement without all of the supporting arguments to prove that the defendant had not voluntarily waived his *Miranda* warnings.

The Michigan Supreme Court denied leave to appeal, *People v. Higgins,* No. 114737, 1999 WL 1201712 (Mich. Nov. 29, 1999), and likewise denied a motion for reconsideration. *People v. Higgins,* No. 114737, 2000 WL 303659 (Mich. Feb. 29, 2000).

Thereafter, the petitioner filed a motion for relief from judgment in the trial court, which the trial court denied because the petitioner failed to demonstrate cause and prejudice for not raising his new issues on direct appeal, citing Mich. Ct. R. 6.508(D)(3)(b). *People v. Higgins,* No. 95–4678 (Third Judicial Circuit Court June 20, 2001).

The petitioner filed an application for leave to appeal the trial court's denial of his motion for relief from judgment in the Michigan Court of Appeals, raising the following claims:

I. Is the trial court's denial of appellant's renewed motion for an evidentiary hearing and new trial based on newly discovered evidence which shows appellant's conviction was obtained on the false coerced sworn testimony of a prosecution witness a violation of his right to due process of law?

II. Was appellant Alton Higgins denied his right to a fair and impartial jury by the trial court's cursory and inadequate voir dire and totally foreclosed defense counsel's participation in the voir dire during jury selection?

III. Was there insufficient evidence as a matter of law to establish appellant Alton Higgins' conviction for felony murder, larceny by stealth, as required by the due process clause?

IV. Did the trial court's confusing and misleading jury instructions and reinstructions on felony murder deprive appellant Higgins of his

due process right to a properly instructed jury and a fair trial?

V. Was appellant Alton Higgins denied the effective assistance of counsel guaranteed him by the federal and state constitutions at trial. Therefore, he is entitled to a new trial and/or a remand for a hearing?

VI. Was defense counsel denied appellant [sic] of his right to effective assistance of counsel where he failed to cross-examine the sole prosecution eyewitness in violation of his right to confrontation and a fair trial?

VII. Did the trial court clearly err when the court denied the motion for mistrial where the sole prosecution eyewitness to the shooting testified defense counsel had spoken to him and assured him that he would be protected and denied appellant of a fair trial consistent with due process of law?

VIII. Did the trial court clearly err where the court allowed the prosecution's key witness to testify after his prior sworn testimony was allowed two days earlier and denied defendant of his right to a fair trial and due process of law?

IX. Was appellant Alton Higgins denied a fair trial where the trial court allowed the prosecutor under the guise of impeachment to place inadmissible hearsay evidence before the jury?

X. Did the prosecution violate appellant Higgins due process rights by not giving full disclosure about the benefits given to Wayne Young in exchange for his testimony. Therefore, an evidentiary hearing is mandated to correct this injustice?

XI. Was appellant Alton Higgins denied a fair trial by the prosecutor's

misconduct and violated his right to due process of law clause of both the federal and state constitutions?

XII. Did the prior trial court clearly err by failing to suppress an incriminating statement attributed to the appellant in violation of his constitutional right against self-incrimination?

XIII. Did the trial court's failure to ascertain on the record whether appellant Higgins intelligently and knowingly waived his right to testify require a new trial?

XIV. Does the cumulative effect of the foregoing errors deny appellant Alton Higgins of a fair trial in violation of due process of law and requires reversal?

XV. Is appellant Alton Higgins entitled to relief from judgment where his appellate counsel denied him of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments?

The state court of appeals denied leave to appeal, *People v. Higgins*, No. 235248 (Mich.Ct.App. Oct. 5, 2001), and the state supreme court denied the petitioner's subsequently-filed application for leave to appeal. *People v. Higgins*, No. 120182, 2002 WL 844962 (Mich. Apr. 29, 2002).

Thereafter, the petitioner filed his petition for a writ of habeas corpus, which presents the following claims:

I. The prosecution through deliberate and repeated forensic misconduct denied Alton Higgins due process and a fair trial in violation of Amendments V, VI, XIV of the United States Constitution.

A. The prosecution suppressed evidence and relied upon coerced and perjured testimony to secure convictions for the felony murder

and firearms charges, which violated petitioner's due process.

B. The prosecution introduced misstated evidence to the jury and argued facts not in evidence to convince the jury of petitioner's guilt.

C. The prosecutor intentionally elicited highly prejudicial testimony from Wayne Young that he had been threatened and was afraid to testify, under the guise of explaining why he earlier failed to appear in court.

II. The trial court's rulings, comments and instructions individually and cumulatively denied Petitioner Higgins an impartial jury, a fair trial and due process of the law guaranteed by the V, VI, and XIV Amendments to the United States Constitution.

A. The trial court's inadequate voir dire and ban preventing defense counsel from contributing to the examination denied petitioner an opportunity to seat a fair and impartial jury.

B. The trial court's comments and denigration of defense counsel demonstrated partiality and its view of the evidence.

C. The trial court's clearly erroneous rulings violated petitioner's right against self-incrimination and his due process rights to a fair trial.

D. The trial court's confusing and misleading jury instructions and denial of petitioner's requested instruction on the credibility of accomplices deprived him of due process and a properly instructed jury.

III. Petitioner Alton Higgins was denied the effective assistance of (trial) counsel in violation of the United States Constitution's Sixth Amendment.

A. Defense counsel's failure to investigate and prepare resulted in a sham trial with an unreliable verdict.

B. Defense counsel's performance fell below an objective reasonable standard, where he failed to object to prejudicial trial errors.

C. Counsel's failure to prepare/investigate and abandonment of his duty to cross-examine Wayne Young denied petitioner his constitutional rights to due process and to confront his accuser.

D. Defense counsel's closing arguments were inappropriate and confrontational.

IV. Petitioner Alton Higgins was denied the effective assistance of (appellate) counsel in violation of the United States Constitution's Sixth Amendment.

V. There was insufficient evidence as a matter of law to establish Petitioner's conviction for felony murder (larceny) as required by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

The respondent filed an answer in opposition to the petition contending that several of the petitioner's issues were procedurally defaulted, and the others lacked merit.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (April 24, 1996), govern this case because the petitioner filed his habeas petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). That Act "circumscribe[d]" the standard of

review federal courts must apply when considering applications for a writ of habeas raising the question of ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. at 521, 123 S.Ct. 2527 (quoting *Williams v. Taylor*, 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)) (internal quotes omitted).

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams v. Taylor*, 529 U.S. at 405–06, 120 S.Ct. 1495.

The Supreme Court held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409, 120 S.Ct. 1495. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n unreasonable application of federal law is different from an incorrect application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410–11, 120 S.Ct. 1495. *See also McAdoo v. Elo*, 365 F.3d 487, 493 (6th Cir.), *cert. denied*, —— U.S. ——, 125 S.Ct. 168, 160 L.Ed.2d 156 (2004); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir.2003) (en banc), *cert. denied*, 541 U.S. 905, 124 S.Ct. 1601, 158 L.Ed.2d 247 (2004); *Lewis v. Wilkinson*, 307 F.3d 413, 418 (6th Cir. 2002).

■ However, where the state court did not evaluate the merits of the petitioner's federal claim, the deferential standard of review prescribed by the AEDPA cannot be applied, since "[t]his statute by its own terms is applicable only to habeas claims that were adjudicated on the merits in State court.... Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition ... questions of law and mixed questions of law and fact [are reviewed] *de novo.*" *Maples v. Stegall,* 340 F.3d 433, 436 (6th Cir.2003) (internal quotes and citations omitted); *see also Clinkscale v. Carter,* 375 F.3d 430, 436 (6th Cir.2004) (holding that where "no state court has adjudicated the merits of Clinkscale's ineffective assistance claim ... the deferential standard of review set forth in section 2254(d) is inapplicable").

### A.

The petitioner in this case has alleged that he was denied his Sixth Amendment right to the effective assistance of counsel because of various errors committed by his trial attorney. The state court of appeals gave that claim short shrift, adjudicating it with these words:

> Finally, defendant contends that he received ineffective assistance of counsel. Specifically, defendant contends he was denied a fair trial when his counsel refused to cross-examine Young. We disagree. "To prove a claim of ineffective assistance of counsel ... a defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense so as to deny defendant a fair trial." *People v. Smith,* 456 Mich. 543, 556, 581 N.W.2d 654 (1998). We conclude that defendant has failed to establish that he was denied effective assistance of counsel because he is unable to show that he was prejudiced by counsel's inaction.

*People v. Higgins,* No. 195865, at 4, 1999 WL 33451714 (Mar. 30, 1999).

The state court did not cite any federal law, but it did refer to the correct test, which the Supreme Court set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show a violation of the right to effective assistance of counsel, a petitioner must establish first that his attorney's performance was deficient "in that it fell below an objective standard of reasonableness." *Towns v. Smith,* 395 F.3d 251, 258 (6th Cir.2005) (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052). The second aspect of the test is a demonstration of prejudice, that is, a showing that counsel's deficient performance may have altered the results of the trial. *Ibid.*

An attorney's performance is deficient if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S.Ct. 2052. An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. 2052. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S.Ct. 2052.

■ As can be seen from the language quoted above, the state court made a con-

clusory determination that the petitioner suffered no prejudice from his attorney's conduct, but it made no finding on the performance component of the test. Therefore, this Court must review the prejudice determination under the AEDPA's deferential standard; however, the performance element is evaluated *de novo*. This mirrors the approach taken by the Supreme Court in *Wiggins,* where there was a state court finding on performance but not prejudice. The Court held that because no state court analyzed the petitioner's claim for prejudice—the second prong of *Strickland*—its "review [wa]s not circumscribed by a state court conclusion." *Wiggins,* 539 U.S. at 534, 123 S.Ct. 2527.

### 1.

■ The petitioner contends that his trial attorney's failure to cross-examine the only eyewitness in the case because of his admitted lack of preparation amounted to deficient performance. As a general rule, trial counsel's strategic decisions on how the trial is to be conducted are afforded great deference. As the Supreme Court explained:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (internal quotes and citations omitted). The Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins,* 123 S.Ct. at 2535 (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052; internal quotes omitted). However, "errors of tactics or omission do not necessarily mean that counsel has functioned in a constitutionally deficient manner." *Greer v. Mitchell,* 264 F.3d 663, 676 (6th Cir.2001).

■ There are times when "[s]ilence can constitute trial strategy," *Warner v. Ford,* 752 F.2d 622, 625 (11th Cir.1985), and declining to question a key State witness, when that decision is based on a strategic choice, can constitute constitutionally acceptable performance. *See Moss v. Hofbauer,* 286 F.3d 851, 864 (6th Cir.2002) (accepting trial counsel's explanation that "[s]he considered [the witness'] testimony to be inherently unbelievable and thought that cross-examination would simply focus additional attention on [the defendant]'s alleged admission").

■ The record in this case, however, leaves no doubt about the reason for attorney Pookrum's failure to cross-examine the key prosecution witness in this case. He candidly admitted that he was not prepared to go forward, and when his request for more preparation time was denied, he blithely forfeited his client's right to confront Wayne Young and subject his direct testimony to cross-examination, "the greatest legal engine ever invented for the discovery of truth." *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (quoting Wigmore, Evidence

§ 1367). Finding that this decision on Pookrum's part was unreasonable creates no danger of trenching upon sound trial strategy after the fact, nor does it implicate the injunction that "an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken." *Campbell v. Coyle,* 260 F.3d 531, 551 (6th Cir.2001). The failure of counsel to participate in a critical phase of the trial, and to subject the State's case to meaningful adversarial testing, on the sole ground of lack of preparation, "was not a reasonable strategic decision entitled to deference." *Moss,* 286 F.3d at 864 (finding that defense counsel's reliance on the cross-examination of an eyewitness by a co-defendant unreasonable when the two defendants' interests were not aligned). The Court finds, therefore, that the petitioner's trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.

### 2.

■ The petitioner has not argued that his trial counsel's deficient performance leads to an irrebuttable presumption of prejudice that could arise under certain limited circumstances. *See United States v. Cronic,* 466 U.S. 648, 658–62, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Attorney Pookrum represented the petitioner's interests throughout the trial and he was not physically absent during any critical phase. The Sixth Circuit has held that deficient performance consisting of the failure to cross-examine a key State witness is the type of error that must be evaluated under *Strickland's* prejudice standard, not *Cronic's per se* rule of prejudice. *See Moss,* 286 F.3d at 859–62 (collecting cases).

In *Strickland,* the Supreme Court made clear that to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceed-ing would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see also Campbell v. United States,* 364 F.3d 727, 730, 736 (6th Cir.2004). In assessing prejudice, the court must reassess the incriminating evidence against the totality of available mitigating evidence. *Wiggins,* 539 U.S. at 534, 123 S.Ct. 2527; *see Kinnard v. United States,* 313 F.3d 933, 935 (6th Cir.2002) (holding that "[t]o determine if the defendant was prejudiced by his attorney's performance, it is necessary to determine if the proceeding was fundamentally unfair or unreliable; a court should not focus the analysis on the outcome"); *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (observing that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective").

Under *Strickland* then, the petitioner must show a "reasonable probability" that, but for his counsel's unprofessional errors, a different result likely would have occurred. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. He does not have to establish that his state trial counsel's deficient conduct "more likely than not altered the outcome in the case." *Id.* at 693, 104 S.Ct. 2052. The "reasonable probability" explicated by *Strickland,* rather, is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. "The question, in other words, is whether counsel's errors were serious enough to deprive the petitioner of a proceeding the result of which was 'reliable'—'whether counsel's conduct so undermined the proper functioning of the adversarial system that the trial … cannot be relied on as having produced a just result.'" *Glenn v. Tate,* 71 F.3d 1204, 1210–11 (6th Cir.1995)

(quoting *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052).

It bears repeating that Wayne Young was the only witness that directly implicated the petitioner as the shooter. Young also was a suspect whose interest in avoiding criminal culpability was tied firmly to convincing the police and the jury that Higgins—and not Young himself—shot Ramsey. This patent interest in the outcome of the trial, however, was left unexplored. In fact, all of Young's damaging testimony against the petitioner went unchallenged. Young had made two statements to the police—turned over two days earlier to defense counsel—and had testified at the preliminary hearing. Since cross-examination was forfeited, there was no effort made to confront Young with inconsistencies in those statements. Young was not questioned about handling guns himself on the day of the shooting, and he was not confronted with the evidence of gunshot residue found on his hands. The plain fact that Young's direct testimony implicating the petitioner was not challenged on cross-examination likely left the jury with the impression that the petitioner tacitly accepted it.

Young also testified that his absence from trial two days earlier was caused by threats from "people." There was no effort to clarify this testimony on cross-examination by demonstrating that Young claimed no knowledge of who had threatened him and could not tie the threats to the petitioner.

Neither the warden nor the State court of appeals observed that attorney Pookrum engaged in some—albeit perfunctory—cross-examination of Young at the preliminary hearing and that questioning presumably was read into the record at trial when Young earlier had been thought to be unavailable. Pookrum did not have Young's two prior statements in his possession on the earlier occasion—he explained in the trial court record that he was "briefed" on the statements by another attorney for the preliminary hearing—and his questions there were not confrontational but rather in the nature of discovery. One might infer from Young's preliminary hearing testimony that he changed his story between the first and second statements, and that he was threatened with prosecution if he did not incriminate the petitioner. However, this potentially fruitful area for the defense was left unexplored at trial because of Pookrum's failure to prepare. The questioning at the preliminary hearing was not a functional substitute for cross-examination at trial and it did not dispel the prejudice that inured to the petitioner from his trial attorney's substandard performance.

The State court of appeals' discussion of the prejudice prong of the *Strickland* test was truncated; that court simply stated that the petitioner failed to show prejudice. Based on the foregoing, however, the Court believes that the State court of appeals' decision was an unreasonable application of Supreme Court precedent that has been clearly established for several years. The Court finds, therefore, that the petitioner's Sixth Amendment right to counsel was violated by attorney Pookrum's failure to cross-examine the key—and only—eyewitness against the petitioner at trial.

### 3.

The petitioner raises additional claims that his trial and appellate attorneys were constitutionally ineffective, but the Court finds no merit in them. He specifically points to his trial attorney's closing argument and the failure to object to various evidentiary offerings. In his closing argument, Mr. Pookrum repeatedly referred to the dispute regarding Mr. Young's testimony. The prosecutor repeatedly objected to Mr. Pookrum's statements and her

objections were sustained. Having carefully considered Mr. Pookrum's closing statement in its entirety and in the context of the entire trial, the Court concludes that Mr. Pookrum's closing statement was poorly constructed and ill-advised. However, it did not fall below the constitutional standard established by *Strickland's* performance prong, and appellate counsel was not ineffective for raising this issue on direct appeal.

■ Similarly, the Court has considered the claim that counsel should have objected to various aspects of the prosecutor's evidence and arguments and finds no deficient performance in that regard by trial counsel. The Sixth Circuit has identified several factors to be considered in determining whether appellate counsel was constitutionally ineffective in failing to raise certain issues on appeal, including whether the omitted issues were significant and obvious, whether the omitted issues were clearly stronger than those presented, and the decision to omit an issue was an unreasonable one that only an incompetent attorney would adopt. *Mapes v. Coyle,* 171 F.3d 408, 427–28 (6th Cir.1999). The Court finds no substandard performance by appellate counsel.

### B.

The petitioner also contends that the prosecutor engaged in misconduct by (1) suppressing evidence and relying upon coerced and perjured testimony; (2) misstating evidence and arguing facts not in evidence; and (3) eliciting testimony from Wayne Young that he was afraid to testify because he had been threatened. Of these claims, only the third was the subject of the petitioner's direct appeal in State court, and as to that issue the court of appeals found that it had been waived for want of a contemporaneous objection. The other two issues were raised in a post-conviction motion, which was denied on the basis of Michigan Court Rule 6.508(D) (re-

quiring the petitioner to establish cause and prejudice for failing to raise an issue on direct appeal). Similarly, the petitioner asserts that the trial court deprived him of a fair trial by: (1) not permitting defense counsel to conduct jury *voir dire* personally; and (2) making erroneous evidentiary rulings. These two issues were not raised on direct appeal, and they were rejected later by the state court under Rule 6.508(D). The respondent argues that all of these issues are barred by the state procedural rules, which is an adequate and independent state law ground that precludes habeas relief. This Court agrees.

■ Habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Couch v. Jabe,* 951 F.2d 94 (6th Cir.1991). The doctrine of procedural default provides:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Such a default may occur if the state prisoner files an untimely appeal, *Coleman,* 501 U.S. at 752, 111 S.Ct. 2546, if he fails to present an issue to a state appellate court at his only opportunity to do so, *Rust v. Zent,* 17 F.3d 155, 160 (6th Cir.1994), or if he fails to comply with a state procedural rule that required him to have done something at trial to preserve his claimed error for appellate review, e.g., to make a

contemporaneous objection, or raise a claim on direct appeal. *United States v. Frady*, 456 U.S. 152, 167–69, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Simpson v. Sparkman*, 94 F.3d 199, 202 (6th Cir.1996). Application of the cause and prejudice test may be excused if a petitioner "presents an extraordinary case whereby a constitutional violation resulted in the conviction of one who is actually innocent." *Rust*, 17 F.3d at 162; *see Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Dretke v. Haley*, 541 U.S. 386, 124 S.Ct. 1847, 1852, 158 L.Ed.2d 659 (2004).

 For the doctrine of procedural default to apply, a firmly established state procedural rule applicable to the petitioner's claim must exist, and the petitioner must have failed to comply with that state procedural rule. *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir.2001), *cert. denied*, 536 U.S. 947, 122 S.Ct. 2635, 153 L.Ed.2d 816 (2002); *see also Warner v. United States*, 975 F.2d 1207, 1213–14 (6th Cir. 1992). Additionally, the last state court from which the petitioner sought review must have invoked the state procedural rule as a basis for its decision to reject review of the petitioner's federal claim. *Coleman*, 501 U.S. at 729–30, 111 S.Ct. 2546. "When a state court judgment appears to have rested primarily on federal law or was interwoven with federal law, a state procedural rule is an independent and adequate state ground[ ] only if the state court rendering judgment in the case clearly and expressly stated that its judgment rested on a procedural bar." *Simpson*, 94 F.3d at 202. Whether the independent state ground is adequate to support the judgment is itself a federal question. *Lee v. Kemna*, 534 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002).

 If the last state court from which the petitioner sought review affirmed the conviction both on the merits and, alterna-tively, on a procedural ground, the procedural default bar is invoked and the petitioner must establish cause and prejudice in order for the federal court to review the petition. *Rust*, 17 F.3d at 161. If the last state court judgment contains no reasoning, but simply affirms the conviction in a standard order, the federal habeas court must look to the last reasoned state court judgment rejecting the federal claim and apply a presumption that later unexplained orders upholding the judgment or rejecting the same claim rested upon the same ground. *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

 The contemporaneous-objection rule was firmly established and frequently followed before the petitioner's 1996 trial, at least with respect to challenges to the admission of evidence, claims of prosecutorial misconduct, and the validity of jury instructions. *See, e.g., People v. Buckey*, 424 Mich. 1, 17–18, 378 N.W.2d 432, 440 (1985); *People v. Sharbnow*, 174 Mich.App. 94, 100, 435 N.W.2d 772, 775 (1989). In such cases, habeas review is foreclosed absent a showing of cause and prejudice. Likewise, the Sixth Circuit has held that Michigan Court Rule 6.508(D), enacted in October 1989, is a firmly-established and regularly-followed state ground precluding subsequent federal habeas review absent a showing of cause and prejudice where the rule was in effect at the time of a petitioner's direct appeal. *Luberda v. Trippett*, 211 F.3d 1004, 1007 (6th Cir.2000), *citing Rogers v. Howes*, 144 F.3d 990 (6th Cir. 1998). Habeas review of these issues, therefore, is precluded in the absence of a showing of cause and prejudice or a miscarriage of justice.

The petitioner cites ineffective assistance of trial and appellate counsel as cause for the failure to abide by the state procedural rules. This Court previously

has held that "[i]neffective assistance of appellate counsel can constitute 'cause' for a procedural default." *Tucker v. Renico*, 317 F.Supp.2d 766, 772 (E.D.Mich.2004) (citing *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). "If [the petitioner] can show that he received ineffective assistance of ... counsel that rose to the level of a violation of his Sixth Amendment rights, it would excuse his procedural default." *Martin v. Mitchell*, 280 F.3d 594, 605 (6th Cir.2002). "Not just any deficiency in counsel's performance will [excuse a procedural default], however; the assistance must have been so ineffective as to violate the Federal Constitution." *Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000).

▮▮▮ This Court does not find that counsels' performance was deficient under the *Strickland* standards recounted above. The state prosecutor's questions to Wayne Young concerning his failure to honor the trial subpoena were not improper, so the failure of trial counsel to object to them did not constitute deficient performance. The Supreme Court has held that a petitioner does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *Jones v. Barnes*, 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir.1990). The issues stated above fall within that purview.

Nor does the Court find that a miscarriage of justice occurred that would permit review of these issues. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 326–27, 115 S.Ct. 851, 130 L.Ed.2d 808

(1995). " '[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324, 115 S.Ct. 851. The petitioner has made no such showing in this case. The petitioner's sufficiency of evidence claim, discussed below, is insufficient to invoke the actual innocence exception to the procedural default doctrine. *See Malcum v. Burt*, 276 F.Supp.2d 664, 677 (E.D.Mich.2003).

### C.

The petitioner next argues that he is entitled to a writ of habeas corpus because the trial court deprived the petitioner of a fair trial by: (1) denigrating defense counsel and commenting on the evidence; and (2) giving confusing and misleading jury instructions and denying the petitioner's requested instruction on the credibility of accomplices. Those issues were rejected by the state court of appeals in the petitioner's direct appeal and are discussed in turn here.

### 1.

▮▮▮ The trial record memorializes some rather spirited and colorful exchanges between defense counsel and the trial judge, which the petitioner believes constitutes improper commentary and criticism of his trial attorney. The first such encounter occurred during the direct examination of Police Officer David Babcock, an evidence technician with the Detroit Police Department. The prosecutor asked Officer Babcock whether he could draw any conclusions as to where the person

who shot Mr. Ramsey had been sitting. Trial attorney Walter Pookrum objected on the ground that Officer Babcock was not qualified to render such an opinion. The following colloquy ensued:

> The Court: Oh, Pookrum, I think any fool can say a person was shot in the back was shot by somebody sitting behind him. I think even—what do you call him?
>
> Prosecutor: Evidence technician.
>
> The Court: Evidence technician can make that assertion. Go ahead, you can ask him that question. You don't have to be rocket scientist to figure that out. Go ahead, you can answer that question.

Tr., Vol. II, at 30.

Shortly after that exchange, Mr. Pookrum objected to a question asked of this same witness regarding whether a gun fired from the back seat would result in a lot of gun residue. Mr. Pookrum objected on the ground that it assumed a fact not in evidence, that the gun was fired from the back seat, resulting in the following exchange:

> The Court: Well, I don't know, Mr. Pookrum. We have heard evidence here from the medical examiner and indicating to Ms. Westveld [the prosecutor] where the gentleman was shot. And as I stated before, anybody can see that the man was shot from the back. I mean, that's the only way he could be shot. I don't think it assumes facts not in evidence because that has been put into evidence.
>
> Mr. Pookrum: Well, if I can just explain.
>
> The Court: I really don't think it's really a real big point to take up a lot of time with, the evidence is that the man was shot in the back.
>
> Mr. Pookrum: If the question has to do with the gun, then I think that's what we should be talking about.

> The Court: Are you objecting about—
>
> Mr. Pookrum: About that phrase about the back seat. Because there's evidence that the—well, it cannot be said that Mr. Ramsey didn't turn. Now, he's falling out of the car, so in his effort to get out of the car it's possible he turned and then could have been shot by someone in the front seat.
>
> The Court: Well, that could be a theory.
>
> Mr. Pookrum: Well, exactly. So that's what I'm saying. If we are going to be talk about the gun and what came from the gun, then let's talk about what came from the gun, not where the gun was fired from when whatever it is came from the gun.
>
> The Court: I don't think having another arguable theory would render invalid the People's theory. They can ask the question, it doesn't assume facts in evidence. There has been evidence on that. And he can say what he did based on the testimony so far.

Tr., Vol. II, at 30–34.

During cross-examination of Officer Babcock, Mr. Pookrum moved for Officer Babcock's testimony regarding where the shooter was sitting to be stricken from the record. The Court ruled:

> The Court: Mr. Pookrum, I think anybody with an ounce of common sense would be able to look at a hole in the back of someone's head and say it was given to him by someone sitting behind him, and I don't think it takes an expert to answer a common sense question.
>
> Mr. Pookrum: With all due respect—
>
> The Court: With all due respect your objection has been overruled because I don't think he answered any question to do with expertise and he answered it with what has to do with common sense. He didn't say he was

an expert in trajectory or firearms examination. All he said was based on what he saw that he would conclude that this was not fired by a person in the front seat.

Mr. Pookrum: Well, I hear what the Court is saying, but what I'm saying is this. You are talking about—

The Court: I will tell you what, Mr. Pookrum, I'm sorry. I'm sorry the question was ever asked. The Court will strike his answer as to where the person was sitting that fired the shot. Will that cure your objection? ... The jury will disregard the witness's testimony that has anything to do with where the shooter was when the shot was fired. You may draw your conclusion from the other evidence.

Tr., Vol. II, at 41–43.

After a discussion outside the presence of the jury, the trial court judge then gave the following cautionary instruction to the jury:

Earlier today I believe that was the evidence technician that was testifying and he was asked some questions about where a person who was shot could have been shot by some person in the front seat, and there was an objection to the question and because he wasn't an expert or whatever that was, and the Court responded, well, you don't have to be an expert to make that conclusion based on the evidence that you heard. Now I wasn't stating to you a fact that this was done by somebody in the back seat. I was merely stating that this gentleman could make that kind of a call based on the evidence that he heard. Now, you are not bound by what he said, of course, because I said to throw all that out, just forget about it. But that fact is there are certain conclusions a person may make from the evidence and you don't really have to be an expert to make the conclusion.

Now, the Court is not telling you that there was someone who did something in the back seat, I was merely saying that based on the evidence that that man could come to that conclusion. And after continuing objections to get this thing moving on, I said, well, fine, forget about it, exclude the testimony what he said about where the person was sitting and you rely on the other evidence that you heard.

What I'm trying to get over to you is I'm not stating any facts to you about where anybody was sitting or where the shot came from. I'm not making any statement to you whatsoever. I was merely stating that anybody with any common sense could draw a conclusion based on what they knew about it. That's all I was saying. You make the decision. I'm not telling you anything. The facts will come from you. Do you understand what I'm saying? I'm not telling you what the facts are, I'm not telling you what the evidence is.

Tr., Vol. II, at 80–81.

On direct appeal, the petitioner argued that these comments by the trial judge rendered his trial unfair. In rejecting this argument, the state court of appeals stated:

Defendant next argues that he was denied a fair trial when the trial court allegedly imparted its personal view of the evidence into the trial, and denigrated defense counsel both personally and professionally in front of the jury. We disagree. "The appropriate test to determine whether the trial court's comments or conduct pierced the veil of judicial impartiality is whether the trial court's conduct or comments were of such a nature as to unduly influence the jury and thereby deprive the appellant of his right to a fair and impartial jury." *People v. Collier,* 168 Mich.App. 687,

698, 425 N.W.2d 118 (1988). Having reviewed each instance of alleged judicial misconduct, we believe that the trial court's behavior was not of the kind that would unduly influence the jury.

*People v. Higgins,* slip op. at 3, 1999 WL 33451714.

 To warrant habeas corpus relief, a trial judge's conduct "must be egregious, and fairly capable of characterization as beyond that necessary to fulfill the role of 'governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.'" *United States v. Tilton,* 714 F.2d 642, 645 (6th Cir.1983) (*quoting Quercia v. United States,* 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933)). "While potential prejudice lurks behind every intrusion into a trial made by a presiding judge, a trial judge remains under a duty to conduct the trial in an orderly fashion, to insure that the issues are not obscured and to act at all times with a view toward eliciting the truth." *Id.* at 644. The Court must consider not only the number of a trial judge's comments and interruptions, but also the "tenor of the interruptions, the extent to which they are directed to one side more than the other, the presence of curative instructions and the nature of the evidence presented at trial." *Id.* at 645. Judicial commentary on the evidence or counsel's performance cannot form the basis for habeas relief unless those comments render the trial fundamentally unfair: "[u]nless they amount to constitutional violations, prejudicial comments and conduct by a judge in a criminal trial are not proper subject for collateral attack on a conviction.'" *McBee v. Grant,* 763 F.2d 811, 818 (6th Cir.1985). To render the trial fundamentally unfair, a trial judge's comments and conduct would have to reach "a significant extent" and be adverse to the defendant "to a substantial degree." *Ibid.* at 818.

This Court finds that the trial judge's comments may have been imprudent and suggested a view of the evidence that properly was to be left to the jury. Where the shooter was sitting plainly was a question of fact and the trial judge should not have stated his belief that the victim was shot from the back. Given the evidence presented on the subject, however, this Court cannot conclude that those comments rendered the trial fundamentally unfair. Nor does it find that the State court of appeals' decision on this issue was contrary to or an unreasonable application of Supreme Court precedent.

2.

 Likewise, this Court finds no merit in the petitioner claim that the trial court deprived him of a fair trial by giving confusing and misleading jury instruction and denying the petitioner's request for an instruction regarding the credibility of accomplices. An erroneous jury instruction warrants habeas corpus relief only where the instruction " 'so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional] right." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The jury instruction " 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle,* 502 U.S. at 72, 112 S.Ct. 475 (quoting *Cupp,* 414 U.S. at 147, 94 S.Ct. 396). The court must "inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Con-

stitution." *Ibid.* (quoting *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).

The Michigan Court of Appeals affirmed the petitioner's conviction over the argument that an accomplice instruction should have been given, stating:

Defendant first asserts that he should be granted a new trial because of the trial court's refusal to give cautionary accomplice instructions. Specifically, defendant argues that because the evidence adduced at trial established that prosecution witness Wayne Young was an accomplice to the crimes charged, either CJI2d 5.4 ("Witness an Undisputed Accomplice") or CJI2d 5.5 ("Witness a Disputed Accomplice") should have been given, along with CJI2d 5.6 ("Cautionary Instruction Regarding Accomplice Testimony"). We disagree.

In *People v. McCoy*, 392 Mich. 231, 240, 220 N.W.2d 456 (1974), the Michigan Supreme Court announced:

For cases tried after the publication of this opinion, it will be deemed reversible error [for a trial court] ... to fail upon request to give a cautionary instruction concerning accomplice testimony and, if the issue is closely drawn, it may be reversible error to fail to give such a cautionary instruction even in the absence of a request to charge.

Because *McCoy* draws an analytical distinction between those situations involving a request for a cautionary instruction and those situations where no request was made, we must first address whether defendant made such a request.

. . .

We are inclined to consider the exchange that took place between the trial judge and defense counsel as a request for, and discussion of an appropriate cautionary instruction on accomplice testimony.... Although the *McCoy* rule regarding a requested cautionary instruction on accomplice testify is stated in absolute terms, we do not read the rule as indicating that the giving of such an instruction is mandatory once a request has been made. As with all requested jury instructions, the applicability of a requested instruction on accomplice testimony must be evaluated in terms of the circumstances of a given case.... For example, it would make no sense for a trial court to be required to give such an instruction when the witness at issue has not admitted to being an accomplice, and there was no evidence in the record that could lead a reasonable person to conclude that the witness was indeed an accomplice.... This Court has also held that an accomplice instruction is not warranted when neither side argues that the disputed witness was an accomplice. *People v. Allen*, 201 Mich.App. 98, 105, 505 N.W.2d 869 (1993). Such is the case here. The People argue that defendant shot and robbed Ramsey. Alternatively, they argue that defendant could also be found guilty if the jury concluded that defendant had aided and abetted another (presumably Young) in the commission of the crimes. Conversely, defendant claims it was Young who shot and robbed Ramsey. Neither side presented Young as an accomplice. Accordingly, because an accomplice instruction would not have fit either party's theory of the case, it was not error for the trial court to reject defendant's request.

*People v. Higgins,* slip op. at 2–3, 1999 WL 33451714.

The trial court instructed the jury on its obligation to determine the credibility of witnesses. Although it would have been preferable to give an instruction on the need to carefully consider the testimony of

a person who may be considered a confederate in a joint criminal undertaking, Wayne Young had not pleaded guilty to the same crime with which the petitioner was charged, and there was no danger of the jury inferring the petitioner's guilt from admissions made at trial by Young. In light of the entire jury instructions, this Court does not find that the State court of appeals' decision rejecting this argument contravened or unreasonably applied Supreme Court precedent.

The petitioner also claims that the trial court's instructions were confusing and misleading because the instruction on felony murder failed to require a finding of guilty beyond a reasonable doubt as to each element of the crime, and because the trial court's reinstruction regarding the difference between first— and second-degree murder was not sufficiently informative. After carefully reviewing the jury instructions, the Court finds that the trial court judge instructed the jury that the prosecution bore the burden of proving each element of felony murder beyond a reasonable doubt.

After deliberating for approximately four hours, the jury submitted the following question to the judge: "Can we have the difference between First Degree and Second Degree?" Tr., Vol. IV, at 135. The Court has reviewed the reinstruction given in response to the jury's question and finds that it adequately conveyed to the jury the elements of first— and second-degree murder under Michigan law. No habeas relief is warranted on this issue.

### D.

Finally, the petitioner claims that the evidence adduced at trial was insufficient to support a conviction for felony murder. This issue was not raised on direct appeal, and the petitioner's post-conviction motion incorporating this issue was denied be-cause he did not show cause and prejudice for his failure to follow state procedure. *See* Mich. Ct. R. 6.508(D)(3).

 The petitioner asserts ineffective assistance of appellate counsel as cause to excuse his procedural default. The Court therefore considers the strength of the petitioner's sufficiency of the evidence claim to assess the reasonableness of appellate counsel's failure to raise this claim on direct appeal. In *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court established that the standard of review for a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781 (emphasis in original). Under Michigan law, the elements of felony-murder are: (1) the killing of a human being, (2) with malice, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies enumerated in the statute. *Bulls v. Jones,* 274 F.3d 329, 335 (6th Cir.2001), *citing People v. Carines,* 460 Mich. 750, 597 N.W.2d 130 (1999). The element of malice "can be established by proving an intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result." *Ibid.* In addition, Michigan law provides that use of a deadly weapon permits an inference of malice. *Ibid.* (citing *Carines,* 460 Mich. at 759, 597 N.W.2d at 136).

 Viewing the evidence in the light most favorable to the prosecution, the Court finds that a rational trier of fact could have found that the prosecution had proven all of the essential elements of felony murder beyond a reasonable doubt.

Accordingly, the Court determines that the petitioner's appellate attorney was not ineffective in failing to present this claim on direct review.

### III.

Although most of the petitioner's arguments were not properly preserved or lack merit, the Court finds that his trial attorney rendered ineffective assistance in failing to cross-examine the only eyewitness to testify against the petitioner at trial, in violation of the Sixth Amendment. The Michigan court's decision to the contrary unreasonably applied well-established Supreme Court precedent. The petitioner, therefore, is in custody in violation of his constitutional rights. *See* 28 U.S.C. § 2254(d).

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus is conditionally **GRANTED.**

It is further **ORDERED** that the petitioner's motions to appoint counsel and for miscellaneous relief [dkt # 16, 18] are **DENIED** as moot.

It is further **ORDERED** that the respondent shall release the petitioner from custody unless the State brings him to trial again within seventy days, subject to the exclusions from such period allowed by 18 U.S.C. § 3161(h).